MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Joann B. and Edward H., who are the biological parents of the minor child Amy B., also known as Amy H., born October 1, 1993. The court finds that the mother and father have been served, have appeared and have court appointed attorneys. The respondent Edward has had, by his recollection six court appointed attorneys, all of which he maintains have inadequately represented him. (See supplemental findings, infra.)
The court having read the verified petitions, the social studies, and having heard the testimony of numerous witnesses including, Dr. Bruce Freedman, Michael Lewis, Vanessa Durantis, Ann Williams, Sandra Clark, Kathy Fickett, Philomena Cardozo, Joanne Anderson, and the respondent mother, makes the following findings by clear and convincing evidence.
FACTUAL FINDINGS
The court finds the following relevant facts.
Much of the history of both respondents comes from the history taken by Dr Freedman in his evaluation of the mother, Joann. Prior to the birth of Amy, her mother had a serious alcohol problem. She reports that every member of her family is an alcoholic. Joann was convicted of vehicular manslaughter as a result of an accident which occurred while she was intoxicated[2]. Her sister-in-law was killed in the accident. Joann was placed on probation for five years.
 Joann told Dr. Freedman that she had gotten involved in I.V. heroin use through Edward H. (The child's male biological parent)
 "She said he was a city guy, who had been in and out of jail his whole life. She said she met him through her brother, at a time when she was in CT Page 10669 physical and emotional distress after her car accident. She said she had already had a drinking problem before that. [Joann] said she had been a hard worker, until 1990 when her mother died, and she started drinking heavily. She said before this she drank a lot, but always made it to work every day. . . . [Joann] said she used heroin for a year or two, and that she had then returned to just abusing alcohol. She said she and Ed H. were together for about a year and a half. She said it was just a drug relationship, both getting high, Ed stealing things from stores. She said the police chased him out of a store, leading to his arrest and current incarceration.
The minor child Amy was born on October 1, 1993. Joann was 33 years of age. Prior to Amy's birth, Joann, realizing she was pregnant, enrolled in a methadone maintenance program at the Connecticut Counseling Center. During the month of Amy's birth the Department of Children and Families ("DCF"), then known as the Department of Children and Youth Services, received a referral and confirmed that Amy was "at risk". The allegations were that Joann was an heroin addict and abused alcohol. DCF did not remove the child.
On January 7, 1995 Amy was 15 months old. On that same date, police officers observed Joann and her brother in, what was thought to be, a drug deal. The police engaged Joann and her brother in pursuit. When finally captured and a search of the car was conducted, the police found drug paraphernalia and a quantity of cocaine. Amy was in the car and her mother was charged with Risk of Injury to a Minor. At the police station a search of Joann revealed a glass pipe and syringe in her sock. A second charge of Possession of Drug Paraphernalia was added to her initial charge. Edward H. was already in jail on other charges. DCF took the child on a 96 hour hold and, after interim foster care, with the agreement of both parents, placed the child with the paternal aunt Jane and her husband on February 21, 1995.
Amy has remained in foster care with the aunt and uncle since that date. The child is by all accounts bonded to the aunt and uncle whom she views as her parents. Dr. Freedman reported and testified that the child should be freed for adoption by the aunt and uncle. To her credit, Joann recognizes her own limitations and long term problems. She admitted to Dr. Freedman that "she CT Page 10670 would not be good for her daughter because of her problems." Joann recognizes that Amy is in good hands and just wanted Amy to know who she was.
Joann, who changed her mind about the termination of her parental rights, was represented by counsel, attended each day of the trial and resisted the termination of her parental rights. Upon the completion of the trial all counsel submitted well reasoned memoranda regarding certain legal issues raised in the course of the trial.
The Mother
With respect to the respondent mother, her child was removed from her care on January 7, 1995 when Amy was 15 months old. Joann saw the child a few times while she was incarcerated in Niantic. After her release from the women's correctional center in Niantic, Joann was hospitalized for hip replacement surgery. In late April, 1995 she left the hospital against medical advise. Her last visit with Amy occurred on April 20, 1995. She began drinking again and did not see Amy for nearly two years. She did not maintain any contact with the foster parents, whom she knew well personally, nor did she communicate in person, by mail or by phone with the child. She did not exhibit any concern for the child. She did not display any affection or interest in the child. During this child's critical developmental years any relationship the child had previously had with the mother was displaced in favor of the foster parents. The day to day nurturing care of the child was performed by the foster parents. Joann, for two crucial years of the infant's life, disappeared. It was, for the child, no different than her mother having died. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal (Docket No. 9489),183 Conn. 11, 14, 438 A.2d 801 (1981). The court concludes that Joann failed to display any interest or concern for the child for such an extended period as to constitute abandonment of the child.
The fact that mother entered Rushford Center in October of 1996 and may have resolved her addiction problems does not alter the situation from the child's optic. After Joann completed her treatment program in early 1997 she requested visitation with Amy. For reasons not known to this court, Joann was permitted five visits with Amy between April 29, 1997 and the date of trial CT Page 10671 September 3, 1997. Those visits, as might be expected, demonstrated little more than a visiting relationship between Amy and a kind person who brought her gifts. The visits clearly did not demonstrate any intimacy, let alone a parent-child relationship. The visits occurred to meet the needs of Joann. The child had no unmet needs in this regard, at the time the visits were ordered.
This situation for Joann raises in a general sense the issue of whether one who abandons a child can later change their mind and resume the parental role. While the court can imagine a case where a parent for all intents and purposes abandons a child and later, before the child has moved on and formed other meaningful relationships, changes their mind and is still able to resume the parental role, this is not such a case.
Here Amy had a parental relationship with only the mother. The father had, through his criminal conduct, rendered himself physically, emotionally and spiritually unavailable and had not established the existence of an actual relationship with Amy that "society recognizes as worthy of respect and protection. . ."[3] The mother, through her criminal conduct and addiction allowed the child to be placed with long-term foster parents. This was not an altruistic gesture on the part of either the father or mother. They were both incarcerated. During the period of foster care the child has lost whatever attachments the child had to its biological parents and, more importantly, formed a reciprocal, quality relationship of the highest magnitude with the foster family. This relationship is commonly known as that of psychological parent.[4] At this point, when through the parents legal proscribed conduct, the child no longer has a parent-child relationship with the parent and has formed a binding relationship with a long-term care-giver, it is, in this court's view, legally too late to change one's mind. The preeminence of the parent's rights has shifted to that of the best interest of the child; "the rights of the `absent' parents should be terminated in favor of the `new' familial ties. These bonds deserve the same protection that ongoing relationships between children and their natural or adoptive parents deserve and traditionally receive."[5]
Joann, in her candid conversations with Dr. Freedman, has herself recognized that Amy has formed other bonds, and that she, Joann, has been displaced as a mother figure in this child's life. CT Page 10672
The Male Biological Parent
The principal problem with allowing Amy to be adopted lies in the conduct and attitude of Edward H., the male biological parent of Amy. The persons who wish to adopt Amy, and are viewed by Amy as her parents, are Edward's sister and her husband, who have actually parented this child for most of Amy's life. As with most people with whom he encounters, Edward is unable to get along with his own sister.
There is very little history of Edward in the DCF social study because Edward would not cooperate with any of the DCF social workers. He would at once, make great demands upon DCF to provide visitation, to bring this reluctant child to prison visitation once a month. Mr. H. has insisted on telephone contact with the child to be paid for by DCF. He insist upon DCF providing him with administrative case reviews in the prison. Yet, Mr H. will not cooperate with DCF regarding his personal history, his education, employment, marital history, other off-spring, military history, medical history which may impact upon the child, or any other information helpful in assessing his ability to parent and social history. Mr H. has refused to cooperate with Dr. Freedman, the court appointed evaluator, either in the parent-child interactional evaluation or in the individual psychological evaluation. He was transported to the office of Dr. Freedman and refused to participate either.[6]
 "From father's presentation, I would tentatively hypothesize that he was extremely suspicious of what a psychologist or others might decide about him, or else that he had somehow calculated that he would have a better chance in court without anyone gathering information more carefully about him." (Testimony of Dr Freedman)
The court is able to gather the following information from the testimony, the evidence and the court's own observations of the respondent in open court[7]. Edward would not say whether he completed high school or served in the military. If he has medical, emotional or genetic problems which might effect his child, he did not disclose them. From the State Police Bureau of Identification records admitted into evidence, the court finds that Edward is a 5'6' tall, white male, who was born on October 14, 1963. The description of Edward by Joann as a heroin CT Page 10673 addicted, petty thief who had been in and out of jail his whole life, is confirmed by his record of adult arrests and convictions. (Petitioner's Exhibit #4). Edward has had 33 arrests as an adult. His juvenile record is unknown but his first adult arrest and conviction for burglary at age 18 resulted in a sentence of three and one half years, execution suspended, suggesting a prior juvenile or youthful offender record. Subsequent arrests for various offenses usually resulted in a plea and conviction for one or more of the offenses. Many of the companion charges were nolled. His convictions were for:
Conviction for: Sentence:
1. Burglary 2 3 and 1/2 years Execution suspended 2. larceny 3 six months 3. Burglary 3 one year 4. Burglary one year 5. Resisting Arrest 6 months 6. Violation of Probation one year 7. Larceny 6 Fine $60 8. Assault 3 30 days Criminal Mischief 90 days Resisting Arrest 90 days 9. Possession of Narcotics 35 months ES one year three years probation 10. Burglary 3 35 months ES one year three years probation 11. Possession of Narcotics five years ES 18 months, five years probation 12. Interfering and Resisting six months
Conviction for (con't) Sentence (con't)
Larceny 6 90 days
13. Larceny 6. 90 days concurrent 14. Larceny 5 Six months 15. Larceny 6 30 days 16. Larceny 6 30 days 17. Larceny 5 90 days 18. Failure To Appear One year 19. Failure To Appear One year 20. Larceny 5 90 days Breach of Peace 90 days 21. Larceny 4 90 days 22. Larceny 5 90 days 23. Larceny 6 90 days 24. Assault 3 One year Probation violation one year, CT Page 10674 25. Threatening One year Larceny 6 Three months Interfering and Resisting One year 26. Larceny 6 Conditional Discharge 30 days suspended 27. Larceny 6 90 days Failure to appear One year Larceny 6 Probation terminated Failure to appear Probation terminated 28. Larceny 6 90 days 29. Assault on Police Officer 61 months in jail Interfering and Resisting One year Failure to appear Three years
The following acts of commission by Edward, which rendered Edward unable to parent his child, occurred after the birth of Amy:
Conviction for: (con't) Sentence: (con't)
30. Robbery 1 (original information) Larceny 2 (substituted) 4 years in jail 31. Possession of Narcotics 4 years in jail Interfering/Resisting One year in jail 32. Larceny 6 30 days in jail 33. Burglary 3 3 years in jail
It is curious to note in light of Edward's impressive history of anti-social, criminal behavior, which conduct has, in part, resulted in his lack of availability to be a parental resource for this child, his total denial. He told Dr. Freedman that he did not believe that he had been involved in any way in the neglect or problems relating to Amy, and that he "had done nothing wrong!" He views Joann as being the problem parent.
Mr. Michael Lewis, a correctional counselor at Gates Correctional Institution ("Gates"), testified. He said that there are programs available to Edward which he has not elected to pursue. DCF had recommended to Edward that he take a parenting class. Gates Correctional Institution offered a parenting class. Edward did not take the parenting class. He did not take the class in managing stress and anger offered at Gates. Mr Lewis testified that after initial in-take assessment of Edward for substance abuse counseling, Edward was found to have a level four assessment which indicates the highest level of drug dependency. Mr. Lewis indicated that with this assessment, Edward should have enrolled in Tier Three and, later, Tier Four drug abuse CT Page 10675 counseling. Edward is eligible to enroll and has been encouraged to enroll but he has declined to enroll. Mr. Lewis testified that the prison officials do not compel inmates to enroll since the inmate would not benefit from the program unless they voluntarily participated. Edward told Dr. Freedman that he did not enroll in the available programs at Gates, because he was busy arranging to go to the Porter and Chester Institute to learn a trade once he is released. The court is not able to ascertain how attending those personal rehabilitation programs offered at Gates and applying by mail to enroll in a post incarceration trade school are mutually incompatible.
Edward has been eligible for early release from his incarceration but he has performed acts of commission while incarcerated that have prevented his early release. Mr. Lewis testified that Edward has received sixteen (16) disciplinary infractions of the highest order, Class A and B violations, and an additional ten (10) class C infractions of discipline. This is an extremely high number of disciplinary violations. As a consequence of these acts of commission, Edward has been denied early release, thus precluding himself from parenting his daughter.
The court specifically finds by clear and convincing evidence, that Edward's criminal acts which occurred after the birth of Amy, and his disciplinary misconduct while incarcerated, constitute acts of commission which have seriously injured his daughter in that these acts by the male biological parent have deprived the child of her right to have a biological parent available to meet her day to day needs. These acts constitute a serious emotional insult to this child which will likely haunt and torment this child her whole life.
As indicated earlier, Edward does not cooperate with either the court or DCF. He does however, insist upon greater visitation than he presently enjoys. His visitation is one visit at prison per month. The court also directed DCF to request the foster mother to bring the child once a month to the prison for additional visitation.(Clark, J.) The foster mother, Edward's sister, refused to do so. DCF social worker Sandra Clark had at least two visits with the foster parents to discuss prison visitation. The child was opposed. Edward was undaunted in his pursuit of visits.
The foster parents were very careful not to offend Edward. CT Page 10676 They told Amy not to be rude, to call him "Daddy", a situation which no doubt confused the child. "Don't call him Edward, that would be rude." Social worker Sandra Clark said that "rude" was Amy's word. The social worker indicated that she agreed with the foster parents that more prison visitation was not in the child's best interest. Edward's standing with this child is that of a stranger. Amy knows who her psychologically real parents are, and Edward, in any sense of this child, is not a parent. The court concludes that the prison visitation met only the needs of Edward. The visitation was of no benefit to the child. It was unsettling, inconvenient and, considering the disposition and temperament of Edward, wholly inappropriate.
In Court Proceedings
The Supreme Court has frequently commented upon the trial court's unique position to observe witnesses:
 The fact-finding function is vested in the trial court with its unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us. Kaplan v. Kaplan, 186 Conn. 387, 391 (1982) 441 A.2d 629
This opportunity to observe becomes more critical in a situation such as this case, where, as here, the court must make judgements about rehabilitation possibilities and parenting skills, without the benefit of a court ordered psychological evaluation. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." In reNicolina T., 9 Conn. App. 598, 605 (1987).
 It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inference therefrom as to the motives underlying their testimony and conduct. Findings based upon these observations in the courtroom are in the same category as findings based upon a view of the premises or property. Such evidence is as properly to be considered by the court in rendering its decision or making its findings as if presented by the lips of witnesses. CT Page 10677 Dadio v. Dadio 123 Conn. 88, 92, 192 A. 557
(1937); State v. McLaughlin 126 Conn. 257, 264, 10 A.2d 758 (1939).
Having witnessed Edward's conduct in court, it is understandable why the foster parents and DCF did not want further visitation. Edward is uncooperative with those around him and difficult, to a fault. At the same time, he is belligerently assertive of perceived violations of his rights which he often raises to constitutional proportion, without any legal foundation. He comes to court with voluminous boxes of documents and, what he maintains, are DCF regulations and policy manuals. He insists that the court and DCF workers are constantly violating his rights as he defines them. He maintains his lawyers are ineffective; the court is biased; and DCF is incompetent[8]. He admits he has no relationship with his sister, yet he insists that she be compelled to bring the child to visit him. He has on a number of occasions, in moments of personal reflection, referred to himself as a "scum-bag". Dr. Freedman testified that he would be vigorously opposed to any reunification efforts for the child with this man. Dr Freedman said that Edward's history of drugs and violence in his criminal record are the best predictors of his future behavior. He testified that these anti-social traits can be passed on to children in very harmful ways. The court agrees with Dr. Freedman's analysis. Edward is, in the court's analysis, a sociopathic personality as that term is commonly understood.[9]
His contact with Amy is not beneficial to her. The child's foster mother has reached this conclusion on her own. No right-thinking parent would want their child to be associated with a belligerent, hostile criminal such as Edward.
The benefit of visitation is decidedly one-sided in favor of Edward. It is of no benefit to the child. DCF reports that Edward does not know how to interact with the child in an age appropriate manner. The child greets him by saying she doesn't want him to talk to her[10]. He refused to permit Dr. Freedman to observe his conduct with the child. Edward devotes a significant amount of his visitation time to arguing and discussing his case with the DCF representative who attends each visit. This is reinforced by, and consistent with, his conduct in court to the same effect.[11] His focus is always about his rights and DCF's wrongs. He robustly insists upon preserving his rights for appeal regarding his perceived injustices by DCF without any consideration of the merits of the termination CT Page 10678 proceedings or of the child's best interest. The proceedings are clearly viewed by Edward as a game which he enjoys playing.
Each of the pendente lite proceedings were usually commenced by Edward interrupting the court to make wandering, prolix statements asserting violations of regulations and policy manuals by DCF personnel and constitutional deprivations of his rights by the court, which rights were usually those associated with criminal proceedings. He has threatened or actually grieved many of the six or more court appointed lawyers, who were unable to satisfy the great demands he placed upon them. He appears anxious to continue the game on the appellate level, as frequently indicated in his pendente lite statements in open court.[12]
 ADJUDICATION
"Since termination of parental rights is the ultimate interference by the state with the natural rights of parents with their children, resulting in an everlasting severance of the legal relationship and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory standards". In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986); See also In re Juvenile Appeal(Anonymous), 181 Conn. 638, 640, 436 A.2d 290 (1980); In reJuvenile Appeal (Anonymous), 177 Conn. 648, 671, 420 A.2d 875
(1979). "The fundamental liberty interest of natural parents in the care, custody and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753 (1982).
This court, mindful of this "ultimate interference", finds by clear and convincing evidence that the loss of the parental role for these parents flows inexorably, and logically, as a result of their own behavior. Edward, from his pervasive criminal activity, disciplinary violations and failure to take available courses to help him deal with his considerable anti-social behaviors, and Joann, from her poly-substance addictions, her self-involvement and lack of interest and empathy for her child during a nearly two year hiatus. Both have demonstrated an absence of concern for the child's welfare during a critical period of the child's development and neither has been available to provide the ". . . permanent nurturing and safe environment" for this child that CT Page 10679 our legislature has declared to be a child's birth right in Connecticut. General Statutes § 17a-101, as amended by Public Act 96-246.
In reaching it's conclusions regarding the grounds for termination of parental rights, Edward H.'s imprisonment deserves particular mention. The court is mindful of the rule that incarceration alone does not constitute abandonment:
 "The trial court was careful to indicate that in its view imprisonment alone does not constitute abandonment, and in this it was correct." See Matter of Adoption of Cottrill, 388 So.2d 302, 305 (Fla.App. 1980); Matter of Adoption of Herman, 406 N.E.2d 277, 279 (Ind.App. 1980); State v. Hennepin County Welfare Board, 178 N.W.2d 709, 712-13 (Minn. 1970); In re Sego, 82 Wash.2d 736, 740, 513 P.2d 831 (1973). In Re Juvenile Appeal (Brenneman, J. confirmed at) 187 Conn. 431, 443 (1982) 446 A.2d 808.
The court also adopts, the view of Judge Frederica Brenneman, that the "voluntary acts" of the respondent are the root of the respondent's problems, not the imprisonment.
I. Acts of Commission or Omission
With respect to the statutory grounds for termination of parental rights, the court finds, by clear and convincing evidence, that Edward H. and Joann B. have committed acts of omission and commission in violation of General Statutes §17a-112 (c) (3) (C) in that the child has been denied the care guidance or control necessary for the child's physical, educational, moral or emotional well being.
Edward was unable to exercise care, guidance and control necessary for the child's physical, educational, moral and emotional well being, by virtue of his voluntary, criminal behavior which resulted initially, in his incarceration, and subsequently his anti-social, post-incarceration voluntary disciplinary infractions which resulted in preventing his early release from incarceration, and accordingly, his availability to "exercise, care, guidance and control" of the child.
Joann was unable to exercise care, guidance and control CT Page 10680 necessary for the child's physical, educational, moral and emotional well being, by virtue of her criminal conduct and drug addiction which also rendered her unavailable to parent the child. She and her brother involved themselves in the sale of drugs for which Joann was arrested for Risk of Injury to a Minor and a second charge of Possession of Drug Paraphernalia. After her release from incarceration, she declined to provide guidance care and control by absenting herself from the child's life for such an extended period that the child did not know who she was.
II. Failure to Rehabilitate
The court further finds that the child has previously been adjudicated neglected on February 15, 1995 (Clark, J.) and that Joann and Edward have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes 17a-112 (c) (3) (B).
Edward has had numerous opportunities in prison to engage in rehabilitative programs. He has declined to address his most pervasive problem, substance abuse. His future plans for post-incarceration training, while hopeful for him personally, come too late to be described as ". . .such degree of personal rehabilitation as would encourage the belief that within a reasonable time such parent could assume a responsible position in the life of the child." His in-court behavior further belies his personal rehabilitation.
Joann has, to her credit, completed treatment at the Rushford Center. But as with Edward, her personal rehabilitation comes too late to benefit the child. This child has been in foster care, in a settled secure and nurturing environment since January, 1995, nearly three years. Joann, even as of this date, is not able to provide a home for this child. Her recovery is fragile. Further delay to allow the parents additional time to be in a position to care for this child, considering the age and needs of the child, would be unreasonable. In Re Christina V., 38 Conn. App. 214,221 (1995) 660 A.2d 863.
III. Abandonment
1. The court further finds that the child has been abandoned by the parents in the sense that the parents have failed to maintain CT Page 10681 a reasonable degree of interest, by the mother, andresponsibility, by the male biological parent as to the welfare of the child. G.S. 17a-112 (c) (3) (A); Edward has constructively abandoned the child by his criminal activity subsequent to the birth of the child which has placed him in a position of incarceration, unavailable to parent. The court finds by clear and convincing evidence that this post-birth criminal activity and post-incarceration disciplinary misconduct of Edward constituted "such conscious disregard and indifference to his parental obligations as to evince a settled purpose to forego his obligation and duties to his child." In Re Juvenile Appeal (Brenneman, J. confirmed at) 187 Conn. 431, 444 (1982)446 A.2d 808. The court further finds that the "interest" that Edward manifests in the form of visitation with the child, such as it was, is not the "interest" of a concerned, caring parent but rather the interest of Edward amusing and entertaining himself at the expense of the Department of Corrections, the Department of Children and Families, the foster parents and the court system; "what a goodly outside falsehood hath."[13] His conduct and demeanor expressed in court belied his declared "interest" in the child; they were evidence of a manipulative person who was entirely self-absorbed. In not one utterance in court did Edward ever express or evince a genuine concern for the child's welfare, safety or future growth and development. The court expressly finds that the incarceration did not cause the abandonment, but rather the pre-incarceration, post-birth, voluntary criminal conduct and post-incarceration misconduct of the respondent was of such uncivil magnitude as to abdicate his role as an appropriate person to parent this child, in the sense that the he failed to maintain a reasonable degree of responsibility as to the welfare of the child. G.S. 17a-112 (c) (3) (A).
With respect to Joann, she abandoned the child through her lack of care, concern and interest between April 20, 1995 and some point no more than two years later when the child lost whatever parental relationship existed and bonded to the foster family. These grounds have existed for over one year.
MANDATORY FINDINGS § 17a-112 (e)
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e), except in the case where termination is based on consent:
1) The timeliness, nature and extent of services offered. The CT Page 10682 court finds that DCF was unable to provide rehabilitative services to Edward due to his incarceration. They did provide foster care for the child, telephone contact and visitation transportation to the prison. Personal rehabilitative programs which would have greatly assisted Edward in his rehabilitation were offered at Gates Correctional Institution but which Edward ignored. Services were offered to the mother in 1993. After the order of temporary custody and subsequent neglect adjudication, Joann became whereabouts unknown to the department and they were therefore unable to offer her any services. Joann was under the supervision of Adult Probation and service were offered to her through that agency.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. No efforts were made to reunite Joann since she had not made her whereabouts known to DCF until they received a call from Rushford Center in October of 1996. Visitation was subsequently arranged to little benefit. Regrettably, the Adoption Assistance and Children Welfare Act of 1980 does not place primacy in the child's best interest. Parents rights are exalted under that act. As a consequence, the department was required to make reunification efforts between an unmarried incorrigible sociopathic individual and a fragile infant. Neither the substantive provisions of the Fourth Amendment, nor the due process protections of the Fourteenth Amendment require such a result, the protestations of the respondent, Edward, notwithstanding. Pena vs Mattox, 84 F.3d 894, 898, (7th Cir. 1996) See also, Santosky v. Kramer, 455 U.S. 745 (1982),Stanley v. Illinois 405 U.S. 645 (1972). DCF complied with the federal mandate. Visitation services were provided and weekly telephone contact was paid for by DCF.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. Edward H. was not available for the preparation of service agreements, expectations and refused to cooperate with court ordered evaluations. Joann violated her agreements regarding addiction services and probation violations.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. With respect Edward H., the respondent father, he has had a visiting relationship with the child. There are no emotional bonds to be broken as none exist. While Joann has recently started visitation with Amy, it CT Page 10683 is an unproductive venture for the child. She is weekly placed in a posture of divided loyalty. She feels comfortable and safe in her present home and calls her foster mother "Mommy". She is required by DCF to visit with this other "Mommy" and "Daddy" who both constitute a potential threat to Amy's present stability. Amy needs to remain in a home that is secure, nurturing, stimulating and safe for the indefinite future. Her mother cannot offer that. Even if the male biological parent were free of incarceration, employed, vocationally trained and employed, none of which are true, placement with him, absent years of psycho-therapy, would not be appropriate.
5) As to the age of the child. Amy is now 4 years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In reJuvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence. . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILDREN (1973) and BEFORE THE BEST INTERESTS OF THE CHILD (1979), The Free Press.
6) The efforts the parents have made to adjust their circumstances or conditions to make it in the best interest of the children to return them to their home in the foreseeable future, including but not limited to: (A) the parent has maintained contact with the children and (B) contacts with the guardian or other custodian: Edward's contacts with the foster parents are hostile. He has made efforts to contact and visit the child, see infra, earlier. Joann's contacts have been previously described. Edward certainly has had opportunity to adjust his circumstances by entering much needed Tier Three and Four programs, anger management classes, and parenting classes. He didn't.
7) The court finds that there has been nothing to prevent the parents from maintaining a meaningful relationship with the children, save their own conduct. There was no unreasonable conduct noted by DCF. There was a great deal of unreasonable conduct noted on the part of Edward. Visitation for Edward has regularly been provided at the prison.
SUPPLEMENTAL FINDINGS;
CT Page 10684
A. Adequacy of Representation. The respondent Edward H. has on several occasions orally moved the court to replace his trial attorney based upon a claim of inadequate assistance of counsel. On the first day of the trial, Sept. 3, 1997 he again claimed that he was receiving inadequate assistance of counsel. The court again denied his motion. The gist of his complaints relate to having insufficient time to spend with his attorney and that his lawyer failed to do what Edward wanted him to do. The court on each occasion that the claim was made listened at length to the complaints. These complaints were mostly to do with visitation and with Edward's perceived grievances with the Department of Children and Families failure to follow its own regulations and policy manuals. They had very little to do with the actual case of termination of his parental rights. It was at all times clear to the court that the problems which Edward had with his various attorneys was the result of his own failure to follow their considered legal opinions and the impositions which Edward placed upon his attorneys which had less to do with the defense of his case and more to do with an offensive action against DCF. The visitation issues had been heard by the court (Clark, J.), and, which had been the subject of an extensive administrative hearing on April 26, 1996 (Respondent's Exhibit E). Edward was dissatisfied with the results of those hearings. This court in pendente lite hearings agreed to hear his motion for additional visitation after he participated in the court ordered parent-child evaluation. (Foley, J. 1/31/97) Edward was advised that if he did not participate in the evaluation, the court would be unable to evaluate whether visitation was in the child's best interest and reserved the right to terminate his visitation altogether. Edward was transported to the doctor's office but refused to be evaluated with the child.
By the conclusion of the three days of trial of the case, it was the court's observation that Edward had realized that he was being extremely well represented by his trial counsel and that his own conduct was undermining the legal defense that was so ably being presented by his attorney. Whether Edward was satisfied or not, the court is satisfied, and accordingly finds that the level of representation presented by his trial attorney greatly exceeded a standard of ordinary competence. Edward was extremely well represented in the trial of the case.
B. Recusal by the court. The respondent father moved on various occasions to have the court recuse itself. The basis of moving to recuse the court was for rulings by the court which Edward CT Page 10685 perceived to be adverse and because Edward had filed five complaints against this judge with the Judicial Review Council.[1] (See Endnote) All complaints were dismissed. All motions to recuse were denied.
C. Protective Orders[14].
(1) As indicated earlier, Edward has continuously maintained during earlier court hearings and the trial itself, of his intention to appeal the decision of the court. This will, regrettably, place the child in a position of continued uncertainty during the appeal period. In consideration of the negative impact of Edward's contact upon the child, as indicated by Dr. Freedman, Edward's refusal to allow a parent-child evaluation, the days of testimony and observations by this court regarding Edward's conduct and history, which would likely be unavailable to any judge who may be asked to hear visitation motions pending appeal and the undesirability of continued visitation, the court enters the following order during the pendency of the anticipated appeal of this decision:
The court finds that continued contact between the minor child Amy and the respondent Edward H. is not in the best interest of the minor child. No visitation shall be granted pending appellate resolution of the case and subsequent re-trial, if ordered. Visitation between Joann and the child shall be at the sole discretion of the foster parents since the court is satisfied that they will act in the child's best interest and that coercive court intervention is decidedly not in the child's best interest. These orders are entered, subject to further order of the court.
(2) The court further directs that a copy of this decision be released to the foster parents. The foster parents are authorized and directed to provide and attach a copy of this decision to any request for Superior Court protective order or restraining order which they may apply for to restrain or order the respondent Edward H. to desist from threatening, harassing, molesting, contacting them or trespassing at their home, business, school or other activities of the foster family, their minor children or their foster child.
(3) As the time for appeal may consume more than a year, and since the minor child is likely to be enrolled in elementary school, the court authorizes the foster parents to allow the CT Page 10686 child to be enrolled in school using their surname provided they are willing to do so and further provided the child wishes to do so.
(4) Further reunification efforts between the child and the biological parents are not appropriate.
DISPOSITION
Based upon the foregoing findings and upon the testimony and evidence presented, the court concludes that it is in Amy's best interest to terminate her parent's rights. This finding is made after considering the child's sense of time, her need for a secure and permanent environment, the relationship that the child has with her foster parents, and the totality of circumstances that the termination of parental rights is in the child's best interest. In re Juvenile Appeal (Anonymous), supra,177 Conn. at 667-68.
The court directs that a judgment of termination of parental rights shall enter with respect to the mother Joann B. and the male biological parent Edward H. and, accordingly, a termination of their parental rights is ordered with respect to their rights in the minor child Amy B., a/k/a Amy H. The Commissioner of DCF is appointed the statutory parent for the purpose of securing an adoptive family. If the present foster parents are willing to adopt, it is the court's direction that they receive first consideration. The commissioner shall file with this court, no later than 90 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Francis J. Foley, III Presiding Judge Child Protection Session