[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum of Decision on State of Connecticut's September 9,1997 Application to Vacate
Facts:
The dispositive issue in this case is whether the State of Connecticut (state) has an explicit, well-defined and dominant public policy prohibiting the Department of Children and Families (DCF) from employing persons convicted of certain drug-related felonies, and on probation, to drive children in the care and custody of DCF. A review of controlling laws and legal precedents convinces me that the answer to this questions is clearly yes. . . .
The state and the defendant entered into a collective bargaining agreement (contract) covering the period from July 1, 1994 to June 30, 1999. The collective bargaining agreement contains provisions with respect to wages, hours of employment, and conditions of P-2 bargaining unit members.
According to the decision of the arbitrator in this case, . . . William Unwin was hired by DCF as a social services assistant on March 17, 1995. His work required him to drive CT Page 2048 children entrusted to the care and/or custody of DCF. The circumstances of such driving — location, duration, collateral duties, age and numbers of children, time involved — is not part of the record. On February 7, 1996, Mr. Unwin pled guilty to felony charges of possession of marijuana with intent to sell in violation of General Statutes Section 21a-277(b), and possession of cocaine with intent to sell in violation of Section21a-278(b). He received a seven-year suspended sentence with three years of probation. He informed DCF of his convictions in April, 1996. The state discharged him on July 29, 1996, pursuant to Article 16 of the contract, and Regulations, Connecticut State Agencies, DAS Section 5-240-1(c)(1) and 5-240-5a, in light of his felony convictions, on the grounds that it had just cause to do so. . . .
The union submitted to arbitration a grievance involving Mr. Unwin's dismissal. . . . The award stated as follows . . .
. . . The State of Connecticut, Department of Children and Families, did not dismiss the grievant for just cause. . . .
 The discharge shall be reduced to a suspension to end with his first day of work, following receipt of this award. . . .
 Thereafter, all rights and privileges shall be afforded to him.
Pursuant to its September 9, 1997, application to vacate, in reliance upon Section 52-418 and common law principles, seeGarrity v. McCaskey, 223 Conn. 1, 6 (1992), the state has moved to have the arbitrator's award vacated. . . . The state argues that the arbitrator's award violates clear public policy and the public interest and must therefore be vacated. . . . The defendant argues among other things, that because the behavior underlying Mr. Unwin's convictions did not occur at the situs of his employment, it cannot provide the basis for a good cause dismissal. . . .
Discussion:
. . . [T]here are numerous cases in which our courts have analyzed and evaluated claims that an arbitrator's award should be vacated as inconsistent with public policy. See, e.g.,Garrity v. McCaskey, supra, 223 Conn. 1 (1992); New Haven v.AFSCME, Council 15, Local 530, supra, 208 Conn. 411 (1988); BoardCT Page 2049of Education v. Local 566, 43 Conn. App. 499, 504-506
(1996) (award requiring reinstatement of grievant, who had been convicted of fraudulently diverting union funds, violated public policy), Town of South Windsor v. South Windsor Police Union,41 Conn. App. 649, 654-658 (1996) (trial court properly determined that arbitration award violated public policy by ordering reinstatement of a police officer who had deliberately revealed the identity of a confidential informant); State v. Council 4,AFSCME, 27 Conn. App. 635, 639-41 (1992) (trial court properly found that arbitration award contravened Connecticut's public policy of not countenancing the knowing misappropriation of state funds by state officials or employees); Town of Groton v. UnitedSteel Workers of America Superior Court, judicial district of New London at New London, Docket No. 544601 (April 23, 1998) (reinstatement of grievant violated clear public policy against embezzlement); Norwalk Board of Education v. AFSCME, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. CV97-0161740 (March 19, 1998) (application by board of education seeking to vacate award reinstating custodian who was convicted of violation of General Statutes Section21a-279(a), prohibiting the possession of drugs within 1,500 feet of a school, denied); International Brotherhood of Police Officersv. Windsor, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 293957 (July 27, 1984)(award, upholding disciplining of police officer who refused to sign a warrant for an arrest which had not been made by him, vacated as contrary to public policy supporting the honesty of police). See also out-of-state and federal cases cited by the state, includingAFL-CIO (AFSCME) v. Dept. of Cent. Mgt., 173 Ill.2d 299,671 N.E.2d 668 (1996) (arbitral award reinstating employee who had falsely stated that she had seen three children in Department of Children and Family Services (DCFS) custody and that they were "doing fine," when they had in fact perished in fire, violated public policy in favor of truthful and accurate reporting by DCFS); Iowa Electric Light and Power Company v. Local Union 204,834 F.2d 1424 (8th Cir. 1987) (arbitration award ordering reinstatement of nuclear power plant machinist who had been discharged for deliberately disregarding federally mandated safety regulations violated public policy).
A two-step analysis should be applied in deciding cases such as this. First, the court must determine whether an explicit, well-defined and dominant public policy can be identified. . . . If so, the court must then decide if the arbitrator's award violated the public policy. AFL-CIO (AFSCME) v. Dept. of Cent.CT Page 2050Mgt. supra, 173 Ill.2d 299.
As the Misco case makes clear, it is important that the public policy exception be narrowly construed and confined to situations where the contract as interpreted violates some explicit public policy that is well-defined and dominant, and is to be determined by reference to laws and legal precedents, "and not from general considerations of supposed public interests." It is critical to keep these limitations in mind, so that judges do not confuse their own or a party's predilections for public policy, or give an unduly expansive interpretation to what is a public policy, in light of the importance of resolving disputes through arbitration where at all possible.
Notwithstanding this, having considered this matter, the Court concludes that this case falls within the relatively limited range of cases in which enforcement of the award would contravene an explicit, well-defined and dominant public policy, namely, the policy against DCF employing persons on probation, following a conviction for felony drug offenses including possession with intent to sell, to drive children in its care and custody. The court concludes that there are multiple sources which make such a child protection policy clear, well-defined, dominant, and, indeed, compelling. . . .
Courts evaluating public policy claims have typically looked to the caselaw to see if the claimed policy in fact exists. Even a cursory review of the relevant caselaw indicates that generally, our courts have recognized that a strong public policy exists to provide a safe environment to children. Even parents' rights are secondary to the state's interest in protecting children when the potential for abuse or neglect exists. Stanleyv. Illinois, 405 U.S. 645 (1972). See also Orsi v. Senatore,31 Conn. App. 400, 431 (1993), reversed 230 Conn. 459 (1994) ("The public policy of this state as enunciated in General Statutes 17-38(a) is [t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary. . . ." (Internal quotation marks omitted); Fedor v. Mauwehu Council, 21 Conn. Sup. 38, 41 (1958) ("It is the policy of the law in every way possible to protect infants.") This duty is widely recognized as one of the most important of governmental functions. See, e.g., AFL-CIO (AFSCME)v. Dept. of Cent. Mgt. supra, 173 Ill.2d 299. In addition, there are innumerable cases in which a parent's a abuse of, or history CT Page 2051 selling, illegal substances has been cited as a contributing factor in the granting of an order of temporary custody, a finding of neglect, or an order terminating parental rights. See, e.g., In Re Roshawn R., 51 Conn. App. 44, 47 (1998)(respondent's history of chronic substance abuse and sale contributed to termination of parental rights); In Re Jeffrey T., Superior Court for Juvenile Matters, Child Protection Session, judicial district of Middletown, 1998 Ct. Sup. 1100 (January 27, 1998) (mother's drug and alcohol use denied her children the care, guidance and control as set out in Section 17a-112(c)(3)(C)); In Re Amy B., Superior Court for Juvenile Matters, Child Protection Session, judicial district of Middletown, 1997 Ct. Sup. 10667 (Oct. 27, 1997). . . .
A variety of provisions in Title 17a articulate the state's strong public policy in favor of providing a safe environment for children. They include, but are not limited to, Section17a-90(c), which empowers the Commissioner of Children and Families to "issue such regulations as he may find necessary and proper to assure the adequate care, health and safety under his care and general supervision"; Section 17a-101(a), which states in part that "The public policy of this state is. . .to provide a temporary or permanent nurturing and safe environment for children when necessary"; Section 17a-114(b), which provides in relevant part that "Notwithstanding the requirements of subsection (a) of this section, the commissioner may place a child with a relative who is not licensed for a period of up to forty-five days provided a satisfactory home visit is conducted, a basic assessment of the family is completed and such relative attests that he and any adult living within the household have not been convicted of a crime or arrested for a felony against a person, for injury or risk of injury to or impairing the morals of a child, or for the possession, use or sale of a controlledsubstance." See also Section 17a-115, permitting commissioner to obtain arrest records of persons charged with injury or risk of injury or impairing the morals of a child, or for possession, use or sale of any controlled substance; and Section 53-21, the risk of injury statute. See, e.g., In re Javron B., Superior Court for Juvenile Matters, Child Protection Section, judicial district of Middletown, 1998 Ct. Sup. 2350 (Feb. 9, 1998).
. . . Like our sister states, see, e.g., AFL-CIO(AFSCME) v.Dept. of Cent. Mgt., 173 Ill.2d 299 (citing a well-defined and dominant public policy favoring the safe transportation of school children), Connecticut has a clear and recognized public policy CT Page 2052 attaching high priority to the safe transportation of school children. This policy is embodied in regulations concerning school bus safety. See, e.g., Regs., Conn. State Agencies, Section 14-275c-3, "Driver to safeguard children;" Section14-275c-13, "Daily physical requirements," subsection f, which states that a school bus driver shall drive a school bus only on days when he has "Freedom from the effects of alcohol or other drugs;" Section 14-275c-50, "Notification of convictions for driver violations and driver's license suspension, " which requires school bus drivers to notify their employers of arrests or convictions for driving under the influence of alcohol or drugs or charges concerning firearms, drugs, or controlled substances; Section 14-275c-51, "Application for employment as driver," requiring applicants for employment as school bus drivers to provide information about criminal convictions in any jurisdiction for the past five years and requires applicants to submit to a urinalysis drug test; and Section 14-275c-53, "Annual update of driving record," which requires an annual review of bus drivers' criminal convictions. Connecticut also has a risk of injury statute which is commonly enforced against parents using drugs in the presence of their children. General Statutes Section53-21; see, e.g., In Re Javron B., Superior Court for Juvenile Matters, Child Protection Session, Judicial District of Middletown, 1998 Ct. Sup. 2350 (February 9, 1998). . . .
It is important to note that in the instant case, the grievant was not convicted only of charges relating to the unlawful possession of narcotics or controlled substances. Both convictions related to possession with intent to sell. There is, to be sure, nothing in the record indicating that the grievant possessed firearms or other dangerous instrumentalities. However, our Supreme Court has noted the "well-established correlation between drug dealing and firearms. . . ." State v. Cooper,227 Conn. 417, 426 n. 5 (1993). . . . Children entrusted to the care and custody of DCF should not be exposed to the risk of potential exposure to violence which drug dealing and this recognized correlation obviously entails, and against which an employee's agreement to undergo periodic drug testing is powerless to protect. Moreover, it is important to note that Mr. Unwin was on probation when he was discharged. That is, he had yet to successfully complete serving his sentence and complying with the conditions established by the court.
Plaintiff insists that because there is no evidence that the grievant used or sold drugs on the job, the public policy CT Page 2053 exception ought not to apply. Plaintiff asserts that off duty conduct, given the circumstances of this case, cannot properly form the basis for a finding that public policy has been violated. The court cannot agree. By the same curious logic, someone convicted of assaulting children in their bedroom could work for DCF, driving children in its care and custody, and could be terminated only if they actually assaulted a child entrusted to DCF while transporting them. Persons engaged in the sale of drugs often fail to make tidy legal distinctions concerning where they engage in their illegal conduct and who they consort with. The court believes that, where the well-being of children is involved, a more practical and nuanced approach is required than a simple analysis of where objectionable conduct has occurred.
Of course, it is not always easy to separate a person's private conduct from his or her work responsibilities. No bright line test exists. Each case must be examined on its merits, with careful analysis of the facts, public policies, and the interests involved. A felony conviction for embezzlement, for example, may have very different consequences for children in a work setting than a felony conviction for drug-related offenses. However, as the state argues, the focus of the court's attention must not be limited to an evaluation of where the questioned conduct occurred . . . rather, . . . "the proper focus is on the relation between the off duty conduct which was the subject of the felony conviction and the work responsibilities."
Focusing on the relation between the offenses and the job responsibilities in this case persuades the court that the award must be vacated in order to avoid subjecting children entrusted to DCF to possible risks which could easily be avoided. The fact that some of the children's parents may have been drug addicts themselves, as noted in the award, is all the more reason to recognize the importance of the policy at issue here. Such children committed to DCF's care and/or custody may need greater assurance, not less, that their caretakers will not expose them to harm. . . .
In light of the above, the court concludes that there exists a well-defined and dominant policy prohibiting DCF from employing persons convicted of felony drug charges of possession with intent to sell, and who are on probation, from driving children who are in the care and custody of DCF. I conclude that the policy in this case is not only defined by positive law, "but are also the clear dictates of common sense." United States PostalCT Page 2054Service v. American Postal Workers Union, 736 F.2d 822, 825 (1st Cir. 1984) (arbitration award requiring Postal Service to reinstate employee who had been convicted of embezzling postal funds violated public policy and thus was unenforceable).
For all of the reasons stated above, the state's September 9, 1997, application to vacate is granted.
Lavine, J.
CT Page 1774