MEMORANDUM OF DECISION
I. Procedural History
This is an action for Termination of Parental Rights brought CT Page 2597 by the child's mother Heidi, to the Probate Court for the District of Groton. Upon the order of the Hon. Frederick W. Palm, Jr., Judge of Probate, the case was transferred pursuant to §45a-715 (g) to the Superior Court for Juvenile Matters. The case was thereafter referred to the Child Protection Session of the Superior Court for Juvenile Matters and was assigned for trial on March 11, 1998. The parties appeared with counsel and were at issue. The court heard the testimony of the petitioner, her husband; and from the respondent Mark A.S., the child's male biological parent. The court received various documents into evidence, which it has thoroughly reviewed. Based upon the testimony and documents in evidence, the court makes the following findings by clear and convincing evidence.
II. Findings of Fact
The petitioner, Heidi, is the female biological parent of the child, Troy, born on November 6, 1984. Troy is now thirteen years of age. He last saw the respondent when he was about five years of age. In his lifetime, Troy has only been in the presence of the male biological parent less than six times. The respondent has never provided support for Troy or provided for his physical care. He is a true stranger to the boy.
The respondent, Mark S., is the male biological parent of the child. He was born on May 17, 1962. He is presently thirty-six years of age. He is a senior member of the Connecticut correctional in-mate population, having been sentenced to two concurrent twenty year terms, execution suspended after eight years. He was found guilty of raping two different women on the same night. The social study indicates he sexually assaulted a teenager and an older woman. His release date is in the year 2003 A.D.
Heidi is two years younger than Mark. She met him while she was a senior in high school. She knew that Mark had been in juvenile facilities and special residential schools for his behavioral problems and criminal acts, mostly burglary and larceny offenses. While they may have been romantically involved, they did not live together until about one month before the child was born. They lived together for about two months after the child was born. They may have separated for a short time before Mark was arrested and went to jail in January, 1985.
Heidi brought the infant to the local correctional center on CT Page 2598 one or two occasions. She let Mark's mother take the infant a couple of times in 1985. Heidi stopped going to the prison and writing to Mark when she found out he was "cheating on her" by writing love letters to another woman and calling her from prison (Respondent's Exhibit B #16). She stopped writing and she stopped visiting. There were no visits in 1986, 1987 and 1988.
Heidi met her present husband when Troy was a year and a half old. She later married James P. on May 28, 1988. They have lived together as a family ever since their marriage. Up until last year Troy did not know that James was not his father. They are extremely close and bonded as if a natural parent child biological bond existed. James is Troy's basketball coach, Tee ball instructor, he brings him to medical visits and is a very active and supportive parent. Troy wishes to be adopted as soon as possible. Since Troy's first surname on the birth certificate was Heidi's maiden name she had Troy's last name changed in the probate court, over the objection of the respondent, to Heidi and Jim's married name.
On January 13, 1989, when Troy was four years old, the respondent obtained an order from the Superior Court (Noren, J.) providing for structured, gradual reunification, first by letters and gifts, then by telephone calls and finally four supervised visits in jail or at the Family Relations office, if the respondent was not incarcerated. The parties were to reappear in court on August 14, 1989 for a subsequent visitation plan.
Three supervised visits occurred at two week intervals while the respondent was in prison. By the time of the fourth visit, the respondent had been released on July 27th and the visit occurred at the Family Relations office. There had been complete compliance with the court order.
Following the fourth visit, Mark disappeared from the child's life. Mark has not seen this child since Troy was nearly five years old. Mark had not seen the child for most of Troy's infancy. While incarcerated Mark had a need for visitation. This was a unilateral need: it served only his interest. Troy had no need to visit Mark and did not benefit by the four visits. It is likely he has no memory of them.
Upon his liberation from the correctional center Mark no longer had a need for visitation or parental reunification. Neither was the respondent burdened by the need to provide CT Page 2599 financial support for his son. He did not contact the child to provide guidance, care, support or demonstrate the concern he now professes. He did not go back to court to arrange for subsequent visitation. He failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child as soon as he was released from prison.
He was out of prison for a year and a half. While out of prison and on probation he was arrested for a burglary. On February 28, 1992 the respondent was sentenced to serve the unexpired portion of his original sentence for the earlier rapes upon a finding of violation of probation. He remains incarcerated to this date. His expected date of release is 2003. He did not attempt to see his son again until he filed a motion in the Superior Court in 1996, six years after the prior court order. The court referred the matter to Family Relations for investigation with a recommendation of no visitation. This action for termination of parental rights was subsequently filed.
With respect to the fact that the respondent is the male biological parent of the child, this court is mindful of the parental rights of a person based on the mere fact of reproduction which give rise to constitutionally protected rights, See, e. g., Roe v. Wade, 410 U.S. 113, 152-153 (1973);Wisconsin v. Yoder, 406 U.S. 205, 231-233 (1972); Stanley v.Illinois, 405 U.S. 645, 651 (1972); Ginsberg v. New York,390 U.S. 629, 639 (1968); Griswold v. Connecticut, 381 U.S. 479
(1965); id., at 495-496 (Goldberg, J., concurring); id., at 502-503, (White, J., concurring); Poe v. Ullman, 367 U.S. 497, 542-544,549-553 (1961) (Harlan, J., dissenting); cf. Loving v.Virginia, 388 U.S. 1, 12 (1967); May v. Anderson, 345 U.S. 528,533 (1953); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535,541 (1942). Usually, this biological connection acts as a "powerful motivating force for most parents to provide their children with continuous affectionate and responsible care. But we recognize that a child's attachments and healthy development do not rest on biology alone. They ultimately depend on the adult caretaker's reciprocal affection in day-to-day care and attention to the child's needs" Goldstein, Freud, and Solnit, Before theBest Interests of the Child, The Free Press (1979) p. 133-134. In cases where the biological parent has failed to discharge their responsibilities, for whatever reason, and the child has bonded to a caring and nurturing step parent, the court must begin to view the blended family as a legally recognized, autonomous unit. A real, de facto, family. Failing to recognize these CT Page 2600 psychological bonds would cause unwarranted destruction to very secure attachments producing both psychological distress and developmental harm to the child.
Further, biology is an important, but not an exclusive consideration. "It is not the brute biological fact of parentage, but the existence of an actual or potential relationship that society recognizes as worthy of respect and protection, that activates the constitutional claim . . . This principle rests on a practical recognition that biology and association can together establish a relationship between father and child that may be essential to the happiness of both, even if the formality of marriage is missing." The United States Court of Appeals for the Seventh Circuit further held that only fatherhood that is "cemented by association with the child" creates an interest that is constitutionally protected. Pena vs Mattox, 84 F.3d 894 (7th Cir. 1996). In the present case, the respondent has a mere genetic connection, there is no parent-child relationship as exists between Heidi's husband, James, and the child. The child has no relationship with Mark, nor he with the child.
Adjudication 
By clear and convincing evidence the court finds that Mark has, by, his conduct subsequent to his release from prison, effectively abandoned the child within the contemplation of General Statutes § 45a-717 (g)(2) Mark's imprisonment hardly complicates the issue. The incarceration of a parent does not alone constitute abandonment. In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431, 443, 446 A.2d 808 (1982); In re JuvenileAppeal (84-6) 2 Conn. App. 705, 711, 483 A.2d 1101 (1984) cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children." In re JuvenileAppeal (Docket No. 10155), supra In Re Shannon S.,41 Conn. Sup. 145, 153, 562 A.2d 79 (1989). He did effectively use his prison time to secure the 1989 court order. His abandonment occurred upon his release when he failed for nearly two years to support, guide or even communicate with the child or pursue appropriate court visitation.
The court further finds by clear and convincing evidence that the respondent has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a CT Page 2601 parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child, General Statutes § 45a-717 (g)(2)(C). "It is reasonable to read the language of `no on-going parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been displaced. In either case, the ultimate question is whether the child has no present memories or feelings for the parent." In re Juvenile Appeal (Anonymous),177 Conn. 648, 670, 420 A.2d 875 (1979). See also In re Juvenile Appeal(Anonymous), 181 Conn. 638, 646, 436 A.2d 290 (1980). The court finds that Troy has no present memories or feelings for the respondent.
These grounds have existed for more than one year.
MANDATORY FINDINGS 
With respect to the mandatory factual findings required by General Statutes § 17a-112 (e),
1) The timeliness, nature and extend of services offered. No child-placing agency was involved with this case, except for the mandatory social study (Respondent's Exhibit # A)
2) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The only court orders were set by the Superior Court (Noren, J.) They were fully complied with but not pursued by the respondent upon his release from prison. Later orders entered in 1996 (Hurley, J.), recommended no visitation and do not impact upon the respondent's earlier abandonment of the child nor do they impact on his failure to have a relationship with the child.
3) The feelings and emotional ties of the child with respect to the parents and step parents, etc. Heidi's husband has embraced Troy as his own child and has raised this child since Troy was a year and a half old. This man is, for all meaningful purposes, Troy's father. They are bonded as father and child. In psychological parlance, he is the psychological parent. The child CT Page 2602 has no relationship with Mark, nor he with the child.
4) As to the age of the child. The child is now 13 years of age. The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPHGOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD (1979), and When Home is No Haven, Child Placement Issues Solnit, Nordhaus and Lord, Yale University Press 1992.
5) The efforts the parents have made to adjust their circumstances or conditions. The male biological parent elected to abandon his reunification efforts once he was freed from prison in 1990.[2] He has no communication with the mother or the psychological father/parent. He has no visitation rights at this time.
7) The court finds that there has been nothing to prevent the father from establishing and maintaining a meaningful relationship with the child. Everything was in place in 1990. The court had provided a framework for gradual reunification. The respondent failed to follow through with the visitation. He simply did not exercise the degree of zeal and resourcefulness that is reasonably expected of a person who has genuine interest and concern for a biologically connected child.
DISPOSITION 
The court finds, based upon the testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of Mark S. to free him for adoption by the only male who has ever genuinely provided day-to-day care and affection. This finding is made after considering the child's sense of time, his need for a secure and permanent environment, the relationship that the child has with his psychological father, and the totality of circumstances that the termination of parental rights is in the child's best interest. In re JuvenileAppeal (Anonymous), supra, 177 Conn. at 667-68.
Based upon the foregoing findings, a termination of parental rights shall enter with respect to the father, Mark S. and, accordingly, a termination of his parental rights is ordered. The children's mother shall be the sole parent and legal guardian of the person of Troy. General Statute § 45a-717 (j). CT Page 2603
By the court,
Francis J. Foley, Presiding Judge Child Protection Session
Prologue
 The Unadoptive Father
 When he was out and on the street his family dues he did not meet, He did not write, he did not call, he did not send support at all. It is only now that while in jail he seeks to parent without fail.
 Behind the bars he spends each night Insisting that he has a "right." His personal needs, he seeks to serve by throwing now a dismal curve, to prevent this child the joyious option, of joining this family by hoped adoption.
 "Now serving my incarceration, I'll get to know my procreation, I didn't meet his daily need, but mine he'll meet, he is my seed."
 When, before, he never cared, or wondered how his youngster fared. The "right" is now too late to claim, on to himself, must fall the blame.
 "No adoption!" the respondent cried, The court, his case, has fully tried, "His tardy protest is contrived. His quest to stop them is denied".
CT Page 2604
 Judge Foley March 13, 1998