[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON STATE OF CONNECTICUT'S SEPTEMBER 9, 1997, APPLICATION TO VACATE
The dispositive issue in this case is whether the State of Connecticut (state) has an explicit, well-defined and dominant public policy prohibiting the Department of Children and Families (DCF) from employing persons convicted of certain drug-related felonies, and on probation, to drive children in the care and custody of DCF. A review of controlling laws and legal precedents convinces me that the answer to this questions is clearly yes.
The facts pertinent to the decision in this case are as follows, as indicated in the parties' December 19, 1997, stipulation, and their submissions.
The state and the defendant entered into a collective bargaining agreement (contract) covering the period from July 1, 1994 to June 30, 1999. The collective bargaining agreement contains provisions with respect to wages, hours of employment, and conditions of employment of P-2 bargaining unit members.
According to the decision of the arbitrator in this case, Reverend Daniel E. Johnson, William Unwin was hired by DCF as a social services assistant on March 17, 1995. His work required him to drive children entrusted to the care and/or custody of DCF. The circumstances of such driving — e.g., location, duration, collateral duties, age and numbers of children, time involved — is not part of the record. On February 7, 1996, Mr. Unwin pled guilty to felony charges of possession of marijuana with intent to sell in violation of General Statutes Section 21a-277(b), and possession of cocaine with intent to sell in violation of Section 21a-278(b). He received a seven-year suspended sentence with three years of probation. He informed DCF of his convictions in April, 1996. The state discharged him on July 29, 1996, pursuant to Article 16 of the contract, and CT Page 15533 Regulations, Connecticut State Agencies, DAS Section5-240-1a(c)(1) and 5-240-5a, in light of his felony convictions, on the grounds that it had just cause to do so.
The union submitted to arbitration a grievance involving Mr. Unwin's dismissal. The parties agreed to the following submission:
 Whether the State of Connecticut, Department of Children and Families, dismissed the grievant, William Unwin, for just cause? If not, what shall the remedy be consistent with the P-2 contract?
An arbitration hearing was held on July 2, 1997. On August 11, 1997, Reverend Johnson issued an award. The award stated as follows, in relevant part:
 In his work with the State, he had been driving around children whose parent or parents may well have been drug addicts themselves. The State felt it could not risk his past felony conviction of intent to sell in retaining his services.
 Now the State does have a policy of furloughing employees who report they have a drug problem. It was "the intent to deliver" which remained paramount in the State's thinking.
 This led the State to ignore a genuinely laudatory letter from the grievant's immediate supervisor which covered well over a year of his employment. There was also the suggestion that State contact with the police and his probationary officer had been superficial, with only verification of facts and dates deemed necessary.
 On the one hand, therefore, we have the State's understandable sensitivity to the charge of selling drugs. On the other hand, we have the grievant's track record in the State's employ, combined with his willingness to submit to drug testing and his continuing relationship with his probation officer, destined to last yet another year and more.
 On balance, both aspects of this unique case, being played out over a period of years should be represented and
CT Page 15534
 reflected in this award. The opportunity for employment in an assignment different from his previous one also cannot be ignored.
 The State of Connecticut, Department of Children and Families, did not dismiss the grievant for just cause.
 The discharge shall be reduced to a suspension to end with his first day of work, following receipt of this award. It shall be no later than September 1, 1997. Thereafter all rights and privileges shall be afforded to him.
Pursuant to its September 9, 1997, application to vacate, in reliance upon Section 52-418 and common law principles, seeGarrity v. McCaskey, 223 Conn. 1, 6 (1992), the state has moved to have the arbitrator's award vacated.[1] The state argues that the arbitrator's award violates clear public policy and the public interest and must therefore be vacated.[2] The defendant argues, among other things, that because the behavior underlying Mr. Unwin's convictions did not occur at the situs of his employment, it cannot provide the basis for a good cause dismissal.
Controlling Legal Principles
A brief review of the controlling legal principles relating to applications of this sort would be helpful before turning to this particular case. In the case of Watertown Police Union Local541 v. Watertown, 210 Conn. 333 (1989), our Supreme Court affirmed the judgment of the trial court, which denied the police union's application to vacate an arbitration award. In that case, at pages 338-340, then Justice, now Chief Justice Callahan summarized relevant caselaw as follows:
 We have consistently stated that arbitration is the favored means of settling differences and arbitration awards are generally upheld unless an award clearly falls within the proscriptions of 52-418 of the General Statutes." Board of Education v. AFSCME, 195 Conn. 266, 270, 487 A.2d 553 (1985); Board of Education v. Bridgeport Education Assn., 173 Conn. 287, 290, 377 A.2d 323 (1977); International Union v. Fafnir Bearing Co., 151 Conn. 650, 653, 201 A.2d 656 (1964); Board of Education v. Local 818, 5 Conn. App. 636, 639, 502 A.2d 426 (1985). A challenge of the arbitrator's authority is limited to a comparison of the award to the submission. Bic
CT Page 15535
 Pen Corporation v. Local No. 134, 183 Conn. 579, 584, 440 A.2d 774 (1981); see also American Universal Ins. Co. v. DelGreco, 205 Conn. 178, 186, 530 A.2d 171 (1987); Board of Education v. AFSCME, supra, 271; Caldor, Inc. v. Thornton, 191 Conn. 336, 340, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985); Bruno v. Department of Consumer Protection, 190 Conn. 14, 18, 458 A.2d 685 (1983); Bridgeport v. Bridgeport Police Local 1159, 183 Conn. 102, 106, 438 A.2d 1171 (1981); Board of Education v. Local 818, supra. An award, therefore, will normally be vacated only if it fails to conform to the submission, and the party challenging it has the burden of producing evidence sufficient to show that it does not conform to the submission. Bic Pen Corporation v. Local No. 134, supra, 585. "`Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that the construction placed upon the facts or the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved Meyers v. Lakeridge Development Co., 173 Conn. 133, 135, 376 A.2d 1105 [1977]'" Id., 584, quoting Waterbury v. Waterbury Police Union, 176 Conn. 401, 404, 407 A.2d 1013 (1979); Caldor, Inc. v. Thornton, supra, 340-41.
 In spite of the general rule that challenges to an arbitrator's authority, are limited to a comparison of the award to the submission, an additional challenge exists under 52-418(a)(4) when the award rendered is claimed to be in contravention of public policy. New Haven v. AFSCME, Council 15, Local 530, 208 Conn. 411, 416-17, 544 A.2d 186 (1988); Stratford v. Local 134, IFPTE, 201 Conn. 577, 590-91, 519 A.2d 1 (1986); Board of Trustees v. Federation of Technical College Teachers, 179 Conn. 184, 195, 425 A.2d 1247 (1979); Stamford v. Stamford Police Assn., 14 Conn. App. 257, 259, 540 A.2d 400 (1988); State v. Connecticut Council 4, CEU, AFSCME, 7 Conn. App. 286, 290, 508 A.2d 806 (1986); International Brotherhood of Police Officers v. Windsor, 40 Conn. Sup. 145, 483 A.2d 626 (1984); Avco Corporation v. Preteska, 22 Conn. Sup. 475, 174 A.2d 684 (1961). This challenge is premised on the fact that the parties cannot expect an arbitration award "approving conduct which is illegal or contrary to public policy to receive judicial
CT Page 15536
 endorsement any more than parties can expect a court to enforce such a contract between them." Stamford v. Stamford Police Assn., supra, 259; Board of Trustees v. Federation of Technical College Teachers, supra, 195. When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is "not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award." Board of Trustees v. Federation of Technical College Teachers, supra. Accordingly, the public policy exception to arbitral authority should be narrowly construed and "[a] court's refusal to enforce an arbitrator's interpretation of collective bargaining agreements] is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant, and is to be ascertained `by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" United Paperworkers International Union v. Misco, Inc., 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); see W. R. Grace Co. v. Rubber Workers, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) . . ." New Haven v. AFSCME, Council 15, Local 530, supra, 417. The party challenging the award "bears the burden of proving that illegality or conflict with public policy is clearly demonstrated." Id. Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the board's award clearly violates an established public policy mandate. (Footnotes omitted).
As noted by Justice Callahan, there are numerous cases in which our courts have analyzed and evaluated claims that an arbitrator's award should be vacated as inconsistent with public policy. See, e.g., Garrity v. McCaskey, supra, 223 Conn. 1
(1992); New Haven v. AFSCME, Council 15, Local 530, supra,208 Conn. 411 (1988); Board of Education v. Local 566,43 Conn. App. 499, 504-506 (1996) (award requiring reinstatement of grievant, who had been convicted of fraudulently diverting union funds, violated public policy); Town ofSouth Windsor v. South Windsor Police Union,41 Conn. App. 649, 654-658 (1996) (trial court properly determined that arbitration award violated public policy by ordering reinstatement of a police officer who had deliberately revealed the identity of a confidential informant); State v. Council 4, AFSCME,27 Conn. App. 635, 639-41 (1992) (trial court properly found that arbitration award contravened Connecticut's CT Page 15537 public policy of not countenancing the knowing misappropriation of state funds by state officials or employees); Town of Groton v.United Steel Workers of America, Superior Court, judicial district of New London at New London, Docket No. 544601, 22 CONN. L. RPTR.57 (April 23, 1998) (reinstatement of grievant violated clear public policy against embezzlement); Norwalk Board of Education v.AFSCME, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. CV97-0161740 (March 19, 1998) (application by board of education seeking to vacate award reinstating custodian who was convicted of violation of General Statutes Section 21a-279(a), prohibiting the possession of drugs within 1,500 feet of a school, denied); International Brotherhood ofPolice Officers v. Windsor, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 293957 (July 27, 1984) (award, upholding disciplining of police officer who refused to sign a warrant for an arrest which had not been made by him, vacated as contrary to public policy supporting the honesty of police). See also out-of-state and federal cases cited by the state, including AFL-CIO(AFSCME) v. Dept. of Cent. Mgt., 173 Ill.2d 299,671 N.E.2d 668 (1996) (arbitral award reinstating employee who had falsely stated that she had seen three children in Department of Children and Family Services (DCFS) custody and that they were "doing fine," when they had in fact perished in fire, violated public policy in favor of truthful and accurate reporting by DCFS); Iowa Electric Light and Power Company v. Local Union 204,834 F.2d 1424 (8th Cir. 1987) (arbitration award ordering reinstatement of nuclear power plant machinist who had been discharged for deliberately disregarding federally mandated safety regulations violated public policy).
A two-step analysis should be applied in deciding cases such as this. First, the court must determine whether an explicit, well-defined and dominant public policy can be identified.[3]
If so, the court must then decide if the arbitrator's award violated the public policy. AFL-CIO (AFSCME) v. Dept. of Cent.Mgt., supra, 173 Ill.2d 299.
As the Misco case makes clear, it is important that the public policy exception be narrowly construed and confined to situations where the contract as interpreted violates some explicit public policy that is well-defined and dominant, and is to be determined by reference to laws and legal precedents, "and not from general considerations of supposed public interests." It is critical to keep these limitations in mind, so that judges do not confuse their own or a party's predilections for public policy, or give an unduly expansive interpretation to what is a CT Page 15538 public policy, in light of the importance of resolving disputes through arbitration where at all possible.
Notwithstanding this, having considered this matter, the Court concludes that this case falls within the relatively limited range of cases in which enforcement of the award would contravene an explicit, well-defined and dominant public policy, namely, the policy against DCF employing persons on probation, following a conviction for felony drug offenses, including possession with intent to sell, to drive children in its care and custody. The court concludes that there are multiple sources which make such a child protection policy clear, well-defined, dominant, and, indeed, compelling.[4]
Sources of the Public Policy 1. Caselaw.
Courts evaluating public policy claims have typically looked to the caselaw to see if the claimed policy in fact exists. Even a cursory review of the relevant caselaw indicates that, generally, our courts have recognized that a strong public policy exists to provide a safe environment to children. Even parents' rights are secondary to the state's interest in protecting children when the potential for abuse or neglect exists. Stanleyv. Illinois, 405 U.S. 645 (1972). See also Orsi v. Senatore,31 Conn. App. 400, 431 (1993), reversed 230 Conn. 459 (1994) ("The public policy of this state as enunciated in General Statutes 17-38(a) is [t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . ." (Internal quotation marks omitted); Fedor v. Mauwehu Council, 21 Conn. Sup. 38, 41 (1958) ("It is the policy of the law in every way possible to protect infants.") This duty is widely recognized as one of the most important of governmental functions. See, e.g., AFL-CIO (AFSCME)v. Dept. of Cent. Mgt., supra, 173 Ill.2d 299. In addition, there are innumerable cases in which a parent's abuse of, or history selling, illegal substances has been cited as a contributing factor in the granting of an order of temporary custody, a finding of neglect, or an order terminating parental rights. See, e.g., In Re Roshawn R., 51 Conn. App. 44, 47 (1998) (respondent's history of chronic substance abuse and sale contributed to termination of parental rights); In Re Jeffrey T., Superior Court for Juvenile Matters, Child Protection Session, CT Page 15539 judicial district of Middletown, 1998 Ct. Sup. 1100 (January 27, 1998); (mother's drug and alcohol use denied her children the care, guidance and control as set out in Section 17a-112(c)(3)(C);In Re Amy B., Superior Court for Juvenile Matters, Child Protection Session, judicial district of Middletown,1997 Ct. Sup. 10667 (Oct. 27, 1997).
 2. Statutory Provisions
A. Drug Statutes: Numerous statutes clearly spell out the state's strong policy against the use and sale of illegal drugs. See, e.g., General Statutes Section 21a-277, Penalty for illegal manufacture, distribution, sale, prescription, dispensing; Section 21a-278, Penalty for illegal manufacture, distribution, sale, prescription or administration by non-drug-dependent person. More specifically, our statutes specifically criminalize the possession and/or sale of narcotics in proximity to schools. See, e g., Section 21a-278a(b); and Section 21a-279(d). SeeState v. Patrick, 42 Conn App. 640 (1996).
B. Child Welfare Statutes: A variety of provisions in Title 17a articulate the state's strong public policy in favor of providing a safe environment for children. They include, but are not limited to, Section 17a-90(c), which empowers the Commissioner of Children and Families to "issue such regulations as he may find necessary and proper to assure the adequate care, health and safety under his care and general supervision"; Section 17a-101(a), which states in part that "The public policy of this state is: . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . ."; Section 17a-114(b), which provides in relevant part that "Notwithstanding the requirements of subsection (a) of this section, the commissioner may place a child with a relative who is not licensed for a period of up to forty-five days provided a satisfactory home visit is conducted, a basic assessment of the family is completed and such relative attests that he and any adult living within the household have not been convicted of a crime or arrested for a felony against a person, for injury or risk of injury to or impairing the morals of a child, or for the possession, use or sale of a controlledsubstance." See also Section 17a-115, permitting commissioner to obtain arrest records of persons charged with injury or risk of injury or impairing the morals of a child, or for possession, use or sale of any controlled substance; and Section 53-21, the risk of injury statute. See, e.g., In re Jayron B., Superior CT Page 15540 Court for Juvenile Matters, Child Protection Section, judicial district of Middletown, 1998 Ct. Sup. 2350 (Feb. 9, 1998).
 3. Relevant Regulations
Like our sister states, see, e.g., AFL-CIO (AFSCME) v. Dept.of Cent. Mgt., supra, 173 Ill.2d 299 (citing a well-defined and dominant public policy favoring the safe transportation of school children), Connecticut has a clear and recognized public policy attaching high priority to the safe transportation of school children. This policy is embodied in regulations concerning school bus safety. See, e.g., Regs., Conn. State Agencies, Section 14-275c-3, "Driver to safeguard children;" Section14-275c-13, "Daily physical requirements," subsection f, which states that a school bus driver shall drive a school bus only on days when he has "Freedom from the effects of alcohol or other drugs;" Section 14-275c-50, "Notification of convictions for driver violations and driver's license suspension," which requires school bus drivers to notify their employers of arrests or convictions for driving under the influence of alcohol or drugs or charges concerning firearms, drugs, or controlled substances; Section 14-275c-51, "Application for employment as driver," requiring applicants for employment as school bus drivers to provide information about criminal convictions in any jurisdiction for the past five years and requires applicants to submit to a urinalysis drug test; and Section 14-275c-53, "Annual update of driving record," which requires an annual review of bus drivers' criminal convictions. Connecticut also has a risk of injury statute which is commonly enforced against parents using drugs in the presence of their children. General Statutes Section53-21; see, e.g., In Re Jayron B., Superior Court for Juvenile Matters, Child Protection Session, Judicial District of Middletown, 1998 Ct. Sup. 2350 (February 9, 1998).
 4. The Convictions Themselves
It is important to note that in the instant case, the grievant was not convicted only of charges relating to the unlawful possession of narcotics or controlled substances. Both convictions related to possession with intent to sell. There is, to be sure, nothing in the record indicating that the grievant possessed forearms or other dangerous instrumentalities. However, our Supreme Court has noted the "well-established correlation between drug dealing and firearms . . ." State v. Cooper,227 Conn. 417, 426 n. 5 (1993). Numerous federal court decisions have CT Page 15541 also remarked upon this correlation. See, e.g., United States v.Simon, 767 F.2d 524, 527 (8th Cir. 1985). Children entrusted to the care and custody of DCF should not be exposed to the risk of potential exposure to violence which drug dealing and this recognized correlation obviously entails, and against which an employee's agreement to undergo periodic drug testing is powerless to protect. Moreover, it is important to note that Mr. Unwin was on probation when was discharged. That is, he had yet to successfully complete serving his sentence and complying with the conditions established by the court.
Plaintiff insists that because there is no evidence that the grievant used or sold drugs on the job, the public policy exception ought not to apply. Plaintiff asserts that off duty conduct, given the circumstances of this case, cannot properly form the basis for a finding that public policy has been violated. The court cannot agree. By the same curious logic, someone convicted of assaulting children in their bedroom could work for DCF, driving children in its care and custody, and could be terminated only if they actually assaulted a child entrusted to DCF while transporting them. Persons engaged in the sale of drugs often fail to make tidy legal distinctions concerning where they engage in their illegal conduct and who they consort with. The court believes that, where the well-being of children is involved, a more practical and nuanced approach is required than a simple analysis of where objectionable conduct has occurred.
Of course, it is not always easy to separate a person's private conduct from his or her work responsibilities. No bright line test exists. Each case must be examined on its merits, with careful analysis of the facts, public policies, and the interests involved. A felony conviction for embezzlement, for example, may have very different consequences for children in a work setting than a felony conviction for drug-related offenses. However, as the state argues, the focus of the court's attention must not be limited to an evaluation of where the questioned conduct occurred. Rather, see page 3 of plaintiff's November 12, 1998, reply brief, "The proper focus is on the relation between the off duty conduct which was the subject of the felony conviction and the work responsibilities."
Focusing on the relation between the offenses and the job responsibilities in this case persuades the court that the award must be vacated in order to avoid subjecting children entrusted to DCF to possible risks which could easily be avoided. The fact CT Page 15542 that some of the children's parents may have been drug addicts themselves, as noted in the award, is all the more reason to recognize the importance of the policy at issue here. Such children committed to DCF's care and/or custody may need greater assurance, not less, that their caretakers will not expose them to harm.
 *****
I agree with the state that defendant's reliance on UnitedPaperworkers International v. Misco, Inc., 484 U.S. 29 (1987), is misplaced. See Plaintiff's Nov. 12, 1998, Reply Brief, at pages 4-11. Misco is distinguishable on its facts in a number of significant respects. In Misco, an employee, Cooper, who operated a hazardous machine, was terminated by his employer, which had a policy listing as cause for discharge the use of controlled substances on company property. An arbitrator upheld Cooper's grievance, finding that there was insufficient proof that Cooper was using or possessing marijuana on company property. The district court vacated the arbitration award and the court of appeals affirmed; however, the United States Supreme Court reversed, ruling that the court of appeals had exceeded the limited authority it possessed in reviewing an arbitrator's award pursuant to a collective bargaining agreement. In Misco, the Supreme Court faulted the court of appeals' action in second-guessing the arbitrator's factfinding. United PaperworkersInternational v. Misco, Inc., 484 U.S. at 39. Moreover, in Misco, Cooper had not been convicted of a felony relating to the sale of drugs, was not on probation, and, most importantly, was not engaging in conduct which could reasonably be viewed as posing a danger to children. In Misco, the potential danger posed by Cooper was to himself or his fellow workers only.
 *****
In light of the above, the court concludes that there exists a well-defined and dominant policy prohibiting DCF from employing persons convicted of felony drug charges of possession with intent to sell, and who are on probation, from driving children who are in the care and custody of DCF. I conclude that the policy in this case is not only defined by positive law, "but are also the clear dictates of common sense." United States PostalService v. American Postal Workers Union, 736 F.2d 822, 825 (1st Cir. 1984) (arbitration award requiring Postal Service to reinstate employee who had been convicted of embezzling postal CT Page 15543 funds violated public policy and thus was unenforceable).
For all of the reasons stated above, the state's September 9, 1997, application to vacate is granted.[5]
Douglas S. Lavine Judge, Superior Court