IN RE JUVENILE APPEAL (DOCKET No. 10155)*

SPEZIALE, C. J., PETERS, HEALEY, ARMENTANO and SHEA, Js.

Argued April 1—decision released June 22, 1982

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 3161, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Reporter of Judicial Decisions

*C. Thomas Furniss,* special public defender, with whom was *Joseph P. Quinn, Jr.,* for the appellant (putative father).

*Richard T. Couture,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (commissioner of the department of children and youth services).

*Donna P. Murphy,* for the minor child.

PETERS, J. This case questions the procedure and the evidence underlying a decision to terminate parental rights. The respondent, a putative father incarcerated outside Connecticut at the time of the termination hearing, claims on appeal that the trial court erred by denying him a continuance until his release from prison and by finding abandonment on the basis of insufficient evidence.

In its memorandum of decision the trial court found the following facts. The child at issue in this appeal, Jesse Henry G., was born on February 19, 1976, to Marlene C. D., who at that time had been separated for some fourteen months from David D., her husband. David D. has made no claim to Jesse's paternity and, although served by publication, has not appeared in person or by counsel

in these termination proceedings. The respondent, Stanley G., was living with Marlene C. D. in Hartford at the time of Jesse's birth and was, by consent, named on Jesse's birth certificate as the child's father. Although he continued to hold himself out as Jesse's father and was named as such by Marlene C. D. on her application for an aid to dependent children grant, Stanley G. has never signed a formal acknowledgement of paternity or contributed to the child's support.

The respondent lived with Marlene C. D. continuously, except for a four month interval, from the time of Jesse's birth until April, 1977, when he left Hartford to avoid an anticipated arrest for assault. He was subsequently arrested in California on an unrelated charge of armed robbery, convicted, and imprisoned in the summer of 1977; his discharge was tentatively scheduled for July, 1980.

Following the respondent's departure from Hartford, he spoke once by telephone with Marlene C. D., who informed him of her intention to sever their relationship. She acted on that intention by obtaining a new address and an unlisted telephone number and had no further contact with the respondent before her death on December 1, 1978. Jesse's maternal grandmother, Mrs. C., then assumed the responsibility of caring for him. When the respondent telephoned her to express his sorrow at Marlene C. D.'s death and to offer possible veteran's benefits for the child's support, the grandmother rejected his assistance. The respondent's only additional contact with Jesse since April, 1977, consists of one birthday card sent in February, 1979.

The termination proceedings leading to this appeal were prompted by Mrs. C.'s decision that

her age and health would no longer permit her to care for Jesse adequately. In April, 1979, she contacted the Connecticut department of children and youth services to request a permanent placement for him. The state then on June 29, 1979, filed two petitions, one seeking to have Jesse declared a neglected child under General Statutes § 46b-120 and the other seeking to terminate the parental rights of the respondent and of David D. under General Statutes § 17-43a (b).[1] After the respondent's October 9 motion seeking a continuance until his expected release from prison was rejected, the parties stipulated to a fact-finding hearing before Referee Gill, which occurred on December 20, 1979, and March 12, 1980.[2] The facts found by the referee were adopted in their entirety by the trial court which, after a hearing on April 17, 1980, rejected the neglect petition but terminated the parental rights of both the respondent and David D. on the ground of abandonment. Only the respondent has taken an appeal.

The respondent raises two issues on this appeal, one procedural and the other evidentiary. First, he claims that the trial court's refusal to grant a continuance until he could be present at the termination hearing was a denial of due process. Second, he claims that the state as petitioner failed to prove by clear and convincing evidence that he had abandoned Jesse.

[1] The state's petition invoked the wrong statute. General Statutes § 17-43a applies only to the termination of parental rights for a child already committed to the commissioner of children and youth services pursuant to General Statutes § 46b-129. The trial court noted the error and properly applied General Statutes § 45-61 (f) throughout these proceedings.

[2] Counsel for the respondent was appointed by the court on September 25, 1979. Jesse was represented by his own counsel throughout these proceedings.

# I

In reviewing the respondent's first claim of error, we recognize that "the rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions," a principle echoed and illuminated in recent years by decisions of the United States Supreme Court and of this court. *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 661, 420 A.2d 875 (1979); see *Santosky* v. *Kramer,* 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *Lassiter* v. *Department of Social Services of Durham County, North Carolina,* 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981); *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 13, 438 A.2d 801 (1981); *Hao Thi Popp* v. *Lucas,* 182 Conn. 545, 551, 438 A.2d 755 (1980); *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 640–41, 436 A.2d 290 (1980); *State* v. *Anonymous,* 179 Conn. 155, 162–63, 425 A.2d 939 (1979); *Anonymous* v. *Norton,* 168 Conn. 421, 425, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975).

The respondent's due process rights are therefore properly determined by the balancing test of *Mathews* v. *Eldridge,* 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), employed by the United States Supreme Court in considering a parent's right in termination proceedings to representation by counsel; *Lassiter* v. *Department of Social Services of Durham County, North Carolina,* supra, 27; and to the use of a clear and convincing standard of proof. *Santosky* v. *Kramer,* supra, 754. *Mathews* v. *Eldridge,* supra, 335, mandates "consid-

eration of three distinct factors. First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." It is these three distinct factors that we must consider in determining the respondent's right to be present at the hearing concerning the termination of his parental rights.

The first factor specified by *Mathews,* the respondent's interest in retaining his parental rights to his son, is clearly both compelling and constitutionally protected. This interest is not undermined by the respondent's failure to be adjudicated Jesse's father by a court of competent jurisdiction, to acknowledge his paternity in writing or to contribute regularly to Jesse's support; General Statutes § 45-61d;[3] since, as the trial court found, he had sufficiently held himself out as Jesse's father to establish his legal interest. *Stanley* v. *Illinois,* supra, 651–52; *Pi* v. *Delta,* 175 Conn. 527, 530–32, 400 A.2d 709 (1978).

The second factor under *Mathews,* the risk of error occasioned by the respondent's absence from the termination hearing, is crucial to the respondent's claim. To evaluate this argument properly, we must first describe the trial court's unusual

[3] General Statutes § 45-61d was subsequently amended; Public Acts 1979, No. 79-592; to add, as criteria for an unmarried father's receipt of notice of termination proceedings, the appearance of his name on the child's birth certificate or his filing of a claim for paternity under General Statutes § 46b-172a.

arrangements to secure the respondent's long-distance participation following its denial of his motion for continuance. At the initial day of hearings before Referee Gill, on December 20, 1979, the state's principal witness, Jesse's maternal grandmother, testified and was cross-examined by the respondent's counsel. A complete transcript of that hearing was then sent to the respondent, who discussed the witness' testimony with his counsel by telephone. At a second session, on March 12, 1980, a speaker was attached to a telephone at the court in Connecticut and the respondent testified from his California prison; his voice was audible to all those attending the hearing, and he was cross-examined by the state and by Jesse's counsel.

The respondent argues that this procedure was inadequate in two respects: it weakened the efficacy of his cross-examination of Mrs. C., and it prevented the trial court from observing his demeanor while testifying. Although this court has denounced "laxity in procedural safeguards" at termination hearings; *Anonymous* v. *Norton,* supra, 425; we do not find the procedures instituted here so lax as to increase significantly the risk of an erroneous deprivation. See *Quaglino* v. *Quaglino,* 88 Cal. App. 3d 542, 547, 152 Cal. Rptr. 47 (1979); *Casper* v. *Huber,* 456 P.2d 436, 437 (Nev. 1969); *In Interest of F. H.,* 283 N.W.2d 202, 209 (N.D. 1979).

The respondent's first argument fails to establish exactly what assistance he might have provided his counsel had he been physically present at the first hearing. The respondent does not deny that he had adequate time for perusal of Mrs. C.'s testimony and for consultation with his attorney. Although the court had offered him the option of deferring cross-examination entirely until the

respondent had an opportunity to see the transcript, he elected instead to have his counsel cross-examine immediately with a reserved right to ask additional questions at the second hearing. Since the respondent did not, in fact, avail himself of this opportunity, we may assume that he was satisfied with the results of the initial cross-examination. Further, there is no claim that the respondent's counsel was an inadequate representative or that the cross-examination that occurred was in any way defective or incomplete. We find no link between the respondent's absence during cross-examination and an increased risk of error.

The second argument, that the fact-finder could not evaluate the respondent's testimony in light of his demeanor, is somewhat more problematic. The record reveals a deep and long-standing hostility between the respondent and Mrs. C., the two chief witnesses, and many areas of express contradiction in their testimony concerning the respondent's behavior toward Jesse and his mother. In choosing between the polarized testimony of these witnesses, the trial court was of course free to consider their demeanor. *Arbour* v. *McCullough,* 186 Conn. 280, 286, 440 A.2d 980 (1982); *Kukanskis* v. *Jasut,* 169 Conn. 29, 32–33, 362 A.2d 898 (1975). We cannot, however, say that the lack of a visual image seriously disadvantaged the trial court in making its determination. The referee heard the respondent's testimony directly and took the opportunity to ask several questions of his own. On this record, limiting the opportunity to assess the respondent's demeanor to its auditory component seems to us to entail only the most marginal risk that the referee would be misled in evaluating the respondent's credibility.

Our consideration of the third factor under *Mathews,* the function involved and the fiscal and administrative burdens placed on the government by securing the respondent's presence at the termination hearing, is complicated by the omissions in the record before us. After the respondent's counsel filed a motion for continuance, he filed as well a motion for a court ordered appearance by the respondent. The record does not indicate any resolution of the second motion, and at oral argument the respondent's counsel could not recall its disposition. Counsel also indicated that he had withdrawn a petition filed in federal court in California requesting the respondent's transfer to Connecticut for the hearing. Although counsel was apparently discouraged in his efforts by his view that neither state would be willing to pay the respondent's transportation costs, the record contains no rejection by any court of the plan to transport the respondent, while still a prisoner, from California to Connecticut. The trial court did, however, deny the respondent's motion for continuance, and it is on this decision that we must focus.

The government's function in seeking to terminate parental rights and place a child in an adoptive home is an aspect of its role as parens patriae. "It is important to note in this relation that the ultimate standard underlying the whole statutory scheme regulating child welfare is the 'best interest of the child.' The public policy of this state as enunciated in General Statutes § 17-38a (a) is '[t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . .' Time is of the essence in child custody cases. See

*In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 420 A.2d 875 (1979). . . . This furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment." *State* v. *Anonymous,* 179 Conn. 155, 170–71, 425 A.2d 939 (1979). When the child whose interest is to be protected is very young, delay in adjudication imposes a particularly serious cost on governmental functioning.

The respondent argues that a continuance until his release would not have unduly burdened the state in the performance of its protective role and observes that he was actually released from prison on June 2, 1980, less than three months after the court issued its memorandum of decision. At the time the motion for continuance was filed in October, 1979, however, the date of the respondent's release was a matter of speculation. Whatever the virtues of hindsight, the trial court cannot be charged with failing to anticipate accurately the date of the repondent's actual release. In light of the state's commitment to provide "a safe, stable nurturing environment" for its children with time "of the essence," we cannot dismiss an open-ended delay in hearing neglect and termination petitions as an insignificant burden.

As applied to the facts of this case, the balancing test of *Mathews* v. *Eldridge* does not support the respondent's due process claim. Although his parental rights are unquestionably a constitutional interest of high magnitude, we can find little risk of error created by the respondent's absence from the termination hearing and a significant burden

on the state's protective role in delaying the hearing until an unscheduled prison release. On this claim there is no error.

## II

The respondent's second claim of error is that the state failed to prove by clear and convincing evidence that he had abandoned his son.[4] This claim necessarily involves a challenge to the trial court's findings of fact and their application to its definition of abandonment; the respondent does not, however, take issue with the definition of abandonment adopted by the court.

General Statutes § 45-61f (d) (1) provides for termination of parental rights upon a finding that "[o]ver an extended period of time but not less than one year the child has been abandoned by the parent . . . ." No statutory definition of abandonment is furnished, and this court has had no occasion to construe the term.[5] The trial court adopted as its definition " 'such conscious disregard and indifference [by a parent] to his parental obligations as to evince a settled purpose to forego his obligation and duties to his child.' " See *Hamby* v. *Hamby,* 264 S.C. 614, 618–19, 216 S.E.2d 536

---

[4] Although General Statutes § 45-61f does not require the use of the clear and convincing standard, both Referee Gill and Judge Brenneman chose to employ that standard. The United States Supreme Court has recently mandated the use of the clear and convincing standard for termination of parental rights. *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[5] General Statutes § 17-43a (a) (1), the statute applicable only to children already committed to the commissioner of children and youth services, provides that parents have abandoned a child if "they have failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare . . . ." Neither party claims that this definition should have been applied by the trial court in this case. The record before us suggests strongly that the evidence herein would have been sufficient to meet this standard as well.

(1975); for other definitions of abandonment, see *Adoption of V.M.C.*, 528 P.2d 788, 792 (Alaska 1974); *Anonymous* v. *Anonymous*, 25 Ariz. App. 10, 12, 540 P.2d 741 (1975); *Petition of C.E.H.*, 391 A.2d 1370, 1373 (D.C. 1978); *In Interest of D. A. H.*, 390 So. 2d 379, 381 (Fla. App. 1980); *Willard* v. *Doyle*, 612 S.W.2d 884, 888 (Mo. App. 1981); *Matter of Corey L.* v. *Martin L.*, 45 N.Y.2d 383, 391, 380 N.E.2d 266 (1978); *Matter of Adoption of Voss*, 550 P.2d 481, 486–87 (Wyo. 1976). Since that definition has not been challenged on this appeal and is a reasonable summation of common law abandonment, we accept it for the limited purpose of reviewing the trial court's conclusions.

In deciding that the respondent had abandoned Jesse, the trial court relied on the twenty-six month separation of father and child. It described that separation as "rooted in the voluntary acts" of the respondent in leaving Hartford and in committing an armed robbery and found no participation by the father in the child's life throughout that period. The court also relied on the respondent's failure to support Jesse during the time they lived together.

The respondent challenges these conclusions by pointing to his own testimony of support for Jesse and thwarted efforts to maintain contact with his son.[6] The short answer to this argument is that the trier of fact heard and rejected his testimony. The record amply endorses the trier's view that the respondent provided neither financial support prior to April, 1977, nor paternal interest thereafter.

[6] The respondent testified that he supported both Marlene C. D. and Jesse from his earnings until he left Hartford, even though at that time both were receiving funds from the state; that before leaving he gave Marlene $6000 and later sent her an additional $1000; and that Mrs. C. was so hostile to him that no contact with Jesse was possible.

The trial court was careful to indicate that in its view imprisonment alone does not constitute abandonment, and in this it was correct. See *Matter of Adoption of Cottrill,* 388 So. 2d 302, 305 (Fla. App. 1980); *Matter of Adoption of Herman,* 406 N.E.2d 277, 279 (Ind. App. 1980); *Staat* v. *Hennepin County Welfare Board,* 178 N.W.2d 709, 712–13 (Minn. 1970); *In re Sego,* 82 Wash. 2d 736, 740, 513 P.2d 831 (1973). On the other hand, the inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child. See *Bell* v. *Wolfish,* 441 U.S. 520, 546–47, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); *Zgleszewski* v. *Zgleszewski,* 542 S.W.2d 765, 767 (Ark. 1976); *Matter of Adoption of Herman,* supra, 279; *Staat* v. *Hennepin County Welfare Board,* supra, 713; *In re Sego,* supra, 740; see generally Jackson, "The Loss of Parental Rights as a Consequence of Conviction and Imprisonment: Unintended Punishment," 6 New Eng. J. of Prison L. 61 (1979); Payne, "The Law and the Problem Parent: Custody and Parental Rights of Homosexual, Mentally Retarded, Mentally Ill and Incarcerated Parents," 16 J. of Fam. L. 797 (1977–78).

The record before us reveals a pattern of unconcern for Jesse's welfare beginning with a flight from Hartford to avoid arrest, extending through a term of imprisonment, and relieved only by the isolated episode of a single birthday card in February, 1979. Although the commission of a crime in California which carried the risk of imprisonment may be seen as part of that pattern, neither the criminal act itself nor the imprisonment which followed is the foundation on which the court's decision to terminate rests. The trial court prop-

erly found that the state had proved by clear and convincing evidence that the respondent displayed "such conscious disregard and indifference to his parental obligations as to evince a settled purpose to forego his obligation and duties to his child."[7]

There is no error.

In this opinion the other judges concurred.

---

[7] Although our decision today approves termination of the respondent's parental rights to Jesse, it does not necessarily preclude all contact with Jesse, if his legal guardians, exercising their own unfettered discretion, decide to permit some limited contact. In this regard we observe that Jesse's present foster parents, who hope to adopt him, have agreed to retain the child's links with Mrs. C. by treating her "as another grandmother."