56 A.3d 814

**In re ADRIANA T.**

**No. 0433, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 29, 2012.

546

548

Nenutzka C. Villamar (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Lindsay E. Brecher (Maryland Legal Aid Bureau, on the brief), Riverdale, MD, for Appellee.

Panel: MEREDITH, HOTTEN, JAMES R. EYLER, (Retired, Specially Assigned), JJ.

HOTTEN, J.

This appeal arises from a decision from the Circuit Court for Prince George's County, sitting as a juvenile court, which ordered the termination of the parental rights of appellant— mother, Monet T. ("Mother") for minor child, Adriana T. ("Adriana"). Mother apparently exhibited delusional behavior while in labor, and the Prince George's County Department of Social Services ("Department") authorized limited custody, and placed Adriana in foster care. The Department filed a Child in Need of Assistance ("CINA") petition, alleging that Mother was unable to care for the child. The court ordered that Adriana be placed in the Department's temporary custody for continued foster care placement. Following a hearing, the court determined that Adriana was a CINA and permitted placement with a relative. The Department filed a Petition for Guardianship with the Right to Consent to Adoption, to which Mother filed an objection. Adriana's father, Detuan J. ("Father"), consented to the termination of his parental rights. Following a hearing on the petition, the court entered judgment terminating parental rights. Mother noted an appeal, and presents two questions for our consideration:

1. Did the court err in permitting a social worker to testify by telephone when [appellee]-child had not complied with Md. Rule 2–513?

2. Did the court err in admitting irrelevant evidence?

For the reasons outlined below, we affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother, now thirty-seven years of age, has suffered from Delusional Disorder Persecutory Type since she was seventeen.[1] On December 20, 2001, Mother suffered from a psychi-

---

1. Delusional Disorder Persecutory Type applies when the central theme of the delusion involves the person's belief that he or she is being

atric episode and believed that her mother, Mary T. ("Grandmother") was complicit in a conspiracy against her. An argument ensued between Mother and Grandmother. Mother left Grandmother's residence, but returned with a handgun. Mother fired two shots at Grandmother, striking her in the chest and abdomen, but Grandmother survived. Mother was arrested and charged with several criminal offenses.[2] On June 16, 2003, Mother was found not criminally responsible and was committed to Perkins Hospital until her conditional release on March 26, 2007.[3]

On November 25, 2009, Mother, who was pregnant, was admitted to the Prince George's Hospital Center because of a preeclampsia diagnosis,[4] which posed a serious health risk to Mother and the unborn child. Mother disregarded the physician's warning and left the hospital. On November 30, 2009, Mother returned to the hospital, but during labor, she again attempted to leave. However, she gave birth to Adriana, and

---

conspired against, cheated, spied on, followed, poisoned, or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals. Individuals with persecutory delusions are often resentful and angry and may resort to violence against those they believe are hurting them. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 298 (4th ed. 1994).

2. Mother was charged with attempted murder, first-degree assault, a handgun violation, and reckless endangerment. On April 2, 2002, Mother was admitted to Clifton T. Perkins Hospital Center ("Perkins Hospital"), a psychiatric hospital, for a competency evaluation. While there, she required four-point and bilateral wrists restraints due to self-injurious behavior. On May 17, 2002, she was found not competent to stand trial.

3. As part of Mother's conditional release, she was to receive mental health treatment and case management services once a week with a mental health therapist and once a month with a psychiatrist, respectively. Mother failed to attend her appointments, and was recommitted to Perkins Hospital in May 2010. While there, she refused to take her medications and attempted to strangle a physically-disabled, elderly patient in a bathroom with a towel.

4. Preeclampsia is the development of hypertension with proteinuria or edema, or both, due to pregnancy or the influence of a recent pregnancy. STEDMAN'S MEDICAL DICTIONARY 1133 (24th ed. 1982).

was subsequently involuntarily committed to the hospital's mental health unit until December 8, 2009.

The hospital sent a report to the Department, explaining that Mother was a risk to herself and to others, and recommended that she not be left alone with the baby. The Department's child protective services investigator interviewed Mother to determine if she was capable of caring for Adriana. Due to Mother's mental state and the inability to identify other relatives in the interim, the investigator issued a report of limited custody.[5]

On December 7, 2009, Adriana was discharged from the hospital and placed in foster care. On December 8, 2009, the Department filed a CINA petition for Adriana.[6] On December 14, 2009, following a hearing which reflected Mother's absence and Father's concurrence with foster care, the juvenile court ordered that Adriana be placed in the temporary care and custody of the Department. The court granted Mother and Father visitation rights, but ordered that visitation be supervised by the Department.[7]

---

**5.** After the limited custody was issued, the investigator continued to search for family members. She identified Father, who was a registered sex offender and incarcerated for violating Mother's protective order, paternal grandparents, and Mother's cousins, but they either expressed no interest or were unable to care for Adriana. Grandmother did express interest, but because she lived in North Carolina, the Department could not place Adriana with her at that time.

**6.** A "Child in Need of Assistance" is a child who requires court intervention because he or she has been abused, neglected, has a developmental disability and/or a mental disorder, and his or her parents, guardian, or custodian, are either unwilling or unable to provide proper care and attention to the child and the child's needs. Md.Code (Repl.Vol.2006), § 3–801(f) of the Courts and Judicial Proceedings Article.

**7.** Adriana was in foster care between January 2010 through May 2010, and Mother visited approximately six times between January 13, 2010 through March 24, 2010. On March 30, 2010, the Department's social worker contacted Mother to confirm the next visitation meeting. Mother indicated her desire to cancel all remaining visits and have Adriana placed for adoption.

During a hearing on March 10, 2010, Mother contended that Adriana was not a CINA, and that based on her history of compliance with therapy and medication, she posed no danger to the child. Although the court found that Mother's physicians indicated her return to therapy and compliance with her medication regimen, there were no mental health evaluations or laboratory results to confirm this. The court "[was] not willing to take a chance on Mother," and determined that Adriana was a CINA and could be placed with a relative.[8]

In May 2010, after the approval of the Interstate Compact for the Placement of Children (ICPC) process,[9] the Department placed Adriana with Grandmother, in North Carolina, where she currently resides. During this time, Ms. Joyce Trott ("Ms. Trott"), the North Carolina social worker, visited Grandmother's residence once a month, monitored Adriana's care, and provided reports to the Department. On October 29, 2010, the Department filed a Petition for Guardianship with Right to Consent to Adoption. Father consented to the petition, but on December 16, 2010, Mother noted her objection. On April 8, 2011, the court determined that the matter was a contested guardianship, and ordered a hearing on the merits.

On June 23, 2011, Adriana filed a motion to take Ms. Trott's testimony by telephone.[10] On June 29, 2011, Mother filed a response, arguing that (1) the motion was not filed in a timely

---

**8.** The court ordered that the Department perform psychological and psychiatric evaluations of Mother to determine whether she was able to safely parent Adriana. The Department made an effort to schedule the court-ordered evaluations, but Mother never complied, and ceased all communications with the Department's social workers.

**9.** The ICPC process entails that "[n]o sending agency shall send, bring, or cause to be sent or brought into any other party state any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this section and with the applicable laws of the receiving state governing the placement of children therein." Md.Code (Repl.Vol.2006), § 5–604(a) of the Family Law Article.

**10.** Counsel was appointed for Adriana.

fashion and it lacked the required contents,[11] which deprived her of the opportunity to depose, oppose, and contact the witness; (2) the court could not determine the witness' demeanor and credibility; and (3) substantial prejudice would result because she would not have the opportunity for face-to-face cross-examination. On July 6, 2011, the court granted Adriana's motion. Additionally, over Mother's objections, the court permitted Grandmother to testify regarding her medical recovery from the gunshot wounds that Mother inflicted. On April 2, 2012, the court ordered that Mother's parental rights be terminated under § 5–323(d) of the Family Law Article.[12] Thereafter, Mother noted a timely appeal.

## STANDARD OF REVIEW

In *In re Adoption/Guardianship of Ta'Niya C.*, 417 Md. 90, 100, 8 A.3d 745 (2010), the Court of Appeals outlined the standard in reviewing a juvenile court's decision to terminate parental rights:

Namely, [w]hen the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c) ]

---

**11.** Rule 2–513. Testimony taken by telephone.

(d) Contents of motion. The motion shall state the witness's name and, unless excused by the court:
(1) the address and telephone number of the witness;
(2) the subject matter of the witness's expected testimony;
(3) the reasons why testimony taken by telephone should be allowed . . .;
(4) the location from which the witness will testify;
(5) whether there will be any other individual present in the room with the witness while the witness is testifying and, if so, the reason for the individual's presence and the individual's name, if known; and
(6) whether transmission of the witness's testimony will be from a wired handset, a wireless handset connected to the landline, or a speaker phone.

**12.** In ruling on a petition for guardianship of a child, a juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the best interests of the child. Md.Code (Repl.Vol.2006), § 5–323(d) of the Family Law Article.

applies.[13] [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* (quoting *In re Yve S.,* 373 Md. 551, 586, 819 A.2d 1030 (2003)) (citations omitted).

██ The trial court is vested with broad discretion in determining the admissibility of evidence. *See* Md. Rule 5–104(a). "Whether to admit lay opinion testimony is vested in the sound discretion of the trial judge." *Bey v. State,* 140 Md.App. 607, 623, 781 A.2d 952 (2001) (citation omitted). Specifically, the trial courts have wide discretion in permitting witnesses to testify by telephone. Audio tape: *Hearing on the Notice of Proposed Rules Changes:* held by the Court of Appeals on the 163rd Report (March 8, 2010). During the Court of Appeals' hearing on Md. Rule 2–513, the Honorable Sally D. Adkins stated, "Obviously, this is going to be a discretionary decision by the trial courts."

██ The trial court abuses its discretion " 'where no reasonable person would take the view adopted by the trial court,' " or when the court does not refer to any guiding principles or rules. *In re Yve S.,* 373 Md. at 583, 819 A.2d 1030 (quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13, 701 A.2d 110 (1997)). "Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed where it is apparent that some serious error or

---

13. Md. Rule 8–131(c) reads:

Action tried without a jury. When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

abuse of discretion or autocratic action has occurred.'" *In re Caya B.*, 153 Md.App. 63, 74, 834 A.2d 997 (2003) (quoting *In re Adoption/Guardianship No. 3598*, 347 Md. at 312, 701 A.2d 110) (internal quotation omitted).

## II. DISCUSSION

### A. Did the Trial Court Err in Permitting the North Carolina Social Worker to Testify By Telephone?

■ Md. Rule 2–513 became effective on July 1, 2010. This rule permits telephone testimony in civil cases under certain conditions. *See* Reporter's Note to Proposed Rule 2–513, Md. Reg., Vol. 37, Issue 3, Friday, January 29, 2010.

Our task is to determine whether the court erred in permitting Ms. Trott's testimony by telephone. Md. Rule 2–513(b)(2) reads, in relevant part:

When testimony taken by telephone allowed; applicability. A court may allow the testimony of a witness to be taken by telephone (1) upon stipulation by the parties or (2) subject to sections (e) and (f) of this Rule, [*infra*] on motion of a party to the action and for good cause shown.

■ During trial, Mother avowed that Adriana failed to satisfy the "good cause" exception. Good cause permits the court to have "some discretion in enforcing the notice requirement, and allows a court, in certain circumstances, to avoid an unjust conclusion." *Prince George's County v. Longtin*, 419 Md. 450, 467, 19 A.3d 859 (2011). Md. Rule 2–513(e) states:

Good cause. A court may find that there is good cause to allow the testimony of a witness to be taken by telephone if:

(1) the witness is otherwise unavailable to appear because of age, infirmity, or illness;

(2) personal appearance of the witness cannot be secured by subpoena or other reasonable means;

(3) a personal appearance would be an undue hardship to the witness; or

(4) there are any other circumstances that constitute good cause for allowing the testimony of the witness to be taken by telephone.

In attempting to orient the Court of Appeals Standing Committee on Rules of Practice and Procedure [hereinafter "Rules Committee"], concerning proposed Md. Rule 2–513, the Honorable Paul E. Alpert,[14] speaking on behalf of the MSBA Judicial Administration Section, stated, "[t]elephone testimony would be allowed if the presence of a witness [was] not available because of financial limitations or because of personal availability. To safeguard abuse of this procedure, the court must find good cause to allow it." Court of Appeals Standing Committee on Rules of Practice and Procedure, Minutes of Meeting of November 16, 2007 at 12, 16. Adriana alleged that she possessed a lack of funds to finance Ms. Trott's travel and hotel expenses, thereby satisfying the good cause exception pursuant to Md. Rule 2–513(e)(4).

Md. Rule 2–513(c) reads:

Time for filing motion. Unless for good cause shown the court allows the motion to be filed later, a motion to take the testimony of a witness by telephone shall be filed at least 30 days before the trial or hearing at which the testimony is to be offered.

Adriana's motion was filed fourteen days prior to the first day of trial, and fifteen days prior to the date that the testimony was offered. As noted previously, during trial, Mother challenged the timeliness of the motion, alleging she was deprived of the opportunity to depose the witness because the motion failed to include the subject matter of the witness' expected testimony. Additionally, she contended that she was unable to contact the witness because of Adriana's failure to include the witness' name, address, and telephone number.

---

14. Judge Alpert, a former member of our Court, sponsored the addition of Md. Rule 2–513. *See* Court of Appeals Standing Committee on Rules of Practice and Procedure, Minutes of Meeting of November 16, 2007 at 12, 18.

During trial, the following colloquy indicated that there was good cause to permit the untimely motion:

THE COURT: I'm saying for the factor of community adjustment, if I don't grant this motion, then the only testimony will be from the grandmother.

[DEPARTMENT'S COUNSEL]: That is correct, Your Honor.

[ADRIANA'S COUNSEL]: Your Honor, I do know that Ms. Trott is the only unbiased resource that has monthly seen [Adriana].

THE COURT: I was trying to say that in a nice way—

\* \* \*

[THE COURT]:—that she's more independent.

\* \* \*

THE COURT: . . . But, I'm saying it would have appeared then that the only source for that element will be someone who's with the child every day in North Carolina. And then I don't know if they have, I looked at his witness list. I don't think there's anyone else who's going to be able to provide that to me. You agree? Unless I let Ms. Trott testify.

Furthermore, Mother acknowledged that Ms. Trott's testimony was "material to the case as it [went] to some of the core issues that . . . the [c]ourt must [have] examine[d] under the [termination of parental rights] statute. So, it [did] impact the case." Hence, the court did not abuse its discretion in concluding that there was good cause to allow the motion to be filed after the deadline.

The Rules Committee's minutes read, in relevant part, as follows:

Judge Alpert told the Committee that the 30–day period provided for in section (c) had been decreased from the initial time period suggested. A lawyer may need time to prepare as to who the witnesses will be. The 30–day period [was] discussed before it was chosen. The [Committee] Chair [,the Honorable Joseph Murphy,] commented that

when one lawyer proposes to the other that a witness's testimony be taken by telephone, the lawyer who has been asked may wish to do some investigation before deciding whether to agree to this. . . . The Chair suggested that the time period could be changed to 15 days, but he expressed the opinion that the 30–day time period [was] not unreasonable. The [trial] court [could] allow the motion to be filed later, so that solve[d] the time problem. . . .

Court of Appeals Standing Committee on Rules of Practice and Procedure, Minutes of Meeting of November 16, 2007 at 12, 25–26.

Regarding the inability of Mother to depose Ms. Trott, although a thirty-day notice was not given, Mother had received Ms. Trott's monthly reports to the Department, through their incorporation into the Department's CINA review reports, which the court took judicial notice of at the onset of the hearing. Thus, Mother received notice of the content of Ms. Trott's status reports and accordingly, was aware of what she would communicate through her testimony. Concerning Mother's inability to contact Ms. Trott, the court willingly assessed the lack of the required contents and determined that Adriana's failure to include the contents were immaterial:

THE COURT: [I will] address each and every one of these elements or it will come back. And I'm not going to leave anything out.

\* \* \*

So if there's something missing and I feel it's material, I will, also, delay this and take [Adriana's counsel's] suggestion and do it in two weeks if I'm not satisfied.

■ Mother next asserts that it was necessary for the court to assess Ms. Trott's demeanor and credibility. "If a party objects to the testimony, a court shall not allow the testimony of a witness to be taken by telephone unless the court finds," among other factors, that "the demeanor and credibility of the witness are not . . . critical to the outcome of the proceeding."

Md. Rule 2–513(f)(3). During trial, Mother argued the following:

> ... [I]t has, the [c]ourt has the, it's duty to determine the credibility of all witnesses and case law has in a variety of different cases said that it is absolutely preferred that witnesses be present for the [c]ourt to observe the demeanor of the witness as opposed to other means of providing that testimony. . . .

In *Phillips v. Venker*, 316 Md. 212, 220, 557 A.2d 1338 (1989), the Court of Appeals noted an unwillingness in conducting evidentiary matters by telephone because of the inability to ascertain the witness' demeanor during testimony. However, the Rules Committee recommended a broadening of electronic means to utilize telephone testimony in certain judicial proceedings. *See* Proposed Rule 2–513, Md. Reg., Vol. 37, Issue 3, Friday, January 29, 2010.

Since Md. Rule 2–513 is relatively new, we examine the development of the rule to obtain helpful background information. The Rules Committee drafted subsection (f)(2) as follows:

> (f) When Testimony Taken by Telephone is Prohibited
>
> If a party objects, a court shall not allow the testimony of a witness to be taken by telephone if the court finds that:
>
> (2) the demeanor and credibility of the witness are or may be critical to the outcome of the proceeding

Judge Adkins noted that the Committee's wording indicated a presumption that telephone testimony was permitted. She further stated, "Well, I'm wondering if it should be, if the burden should be shifted a little bit, so that the judge should only do it if it makes certain findings." The Court agreed, and decided to construct the letter of the rule such that it indicated "affirmative findings," so the presumption was that telephone testimony was not permitted unless the court made specific findings. Thus, the wording was changed to the following:

> (f) When testimony taken by telephone is prohibited. If a party objects, a court shall not allow the testimony of a witness to be taken by telephone *unless* the court finds that:

(3) the demeanor and credibility of the witness *are not* likely to be critical to the outcome of the proceeding

We have not found any Maryland case law on the specific issue, nor have the parties supported their contentions with case law. While this issue is one of first impression in Maryland, several jurisdictions have undertaken consideration of the safeguards required under similar circumstances. Md. Rule 2–513 was modeled after a statute and rule in Oregon. Court of Appeals Standing Committee on Rules of Practice and Procedure, Minutes of Meeting of November 16, 2007 at 12, 18. Hence, we consult Oregon's cases, in addition to other sister states, to determine the extent a witness' credibility may be material, as well as the fair opportunity to cross examine witnesses who testify by telephone in civil proceedings.

In *State v. Parker*, 317 Or. 225, 855 P.2d 636, 639 (1993), the Oregon Supreme Court resolved the conflict of whether the trial court erred in permitting the defendant's expert to testify via telephone. There, the defendant was indicted for driving under the influence of intoxicants and for breaching the duty of a reasonable and careful driver. *Id.* at 637. The defendant motioned for a continuance because his initial expert was unavailable for trial. *Id.* at 639. The court denied the motion, but permitted the telephone testimony from another expert witness. *Id.*

The defendant averred that the court's denial was prejudicial because he could not present demeanor evidence. *Parker*, 855 P.2d at 639. The Oregon court determined that the defendant had obtained three continuances and had adequate time to prepare for expert testimony. *Id.* As a result, the loss of demeanor evidence was not material, so there was no abuse of discretion. *See id.*

In *Babcock v. Employment Div.*, 72 Or.App. 486, 696 P.2d 19, 20 (1985), the plaintiff averred that the Employment Appeals Board violated Oregon's statutes and rules when it conducted a telephone hearing in deciding to deny her unem-

ployment benefits. Specifically, the plaintiff asserted that the Administrative Law Judge (ALJ) could not adequately determine the witnesses' demeanor and credibility. *Id.* at 21. The Oregon court concluded that although the physicality of a witness was a clue to credibility, a witness' assertion and how he or she asserted it was of equal and greater value. *Id.* "Beyond testing credibility by the inherent plausibility of a witness' testimony . . .," the court concluded that the "audible indicia of a witness' demeanor [was] sufficient" for the ALJ to find an adequate judgment concerning believability. *Id.* (citations omitted). *But see State ex rel. Juvenile Dep't of Multnomah County v. Gates,* 86 Or.App. 631, 740 P.2d 217, 218 (1987) ("The opportunity to observe a witness is so critical to judicial control and effective cross-examination that its denial is manifestly prejudicial.").

In *In re Juvenile Appeal (Docket No. 10155),* 187 Conn. 431, 446 A.2d 808, 812 (1982), the incarcerated father testified from prison relating to the termination of his parental rights. The father argued that the trial court erred because it could not assess his demeanor while testifying. *Id.* The Supreme Court of Connecticut concluded that:

> We cannot, however, say that the lack of a visual image seriously disadvantaged the trial court in making its determination. The referee heard the [father's] testimony directly and took the opportunity to ask several questions of his own. On this record, limiting the opportunity to assess the [father's] demeanor to its auditory component seems to us to entail only the most marginal risk that the referee would be misled in evaluating the [father's] credibility.

*Id.*

In *In re Megan L.,* 128 N.M. 618, 995 P.2d 1060, 1062 (Ct.App.2000), the New Mexico Court of Appeals sought to determine whether the trial court abused its discretion in permitting telephone testimony during a termination of parental rights ("TPR") proceeding.[15] The Children, Youth & Fam-

---

**15.** The New Mexico Court of Appeals determined that the mother's contentions involved a question of law relating to due process, as well

ilies Department (CYFD) received a referral that a child had
been sexually abused by her stepfather. *Id.* CYFD filed a
motion to terminate the parental rights, and sought to elicit
telephone testimony of six CYFD witnesses.[16] *Id.* at 1063.
Among other contentions, the mother asserted that the wit-
nesses should have been personally presented because the
court needed to evaluate their "demeanor, body language, and
other physical aspects." *Id.* at 1064. Since the witnesses
merely testified regarding the mother's evaluation and the
child's behavior, the New Mexico court held that the mother
failed to demonstrate that any of the witnesses' credibility and
veracity were critical issues requiring their personal presence.
*See id.* at 1067–68.

In the case *sub judice,* when Mother's counsel alluded to the
court's assessment of Ms. Trott's demeanor and credibility,
the following colloquy ensued:

THE COURT: That probably is more important with re-
spect to a witness other than a social worker. Just your
regular civilian witness. I think jurors more so than a
judge need to look at their demeanor when they're testify-
ing. I don't think that that [sic] criteria is actually applica-
ble to this witness, per se. I just don't think in the nature
of her business that that [sic] would be a factor for me. I
mean, she'll say what's she's going to say. I'm not going to
say that her demeanor she—

[MOTHER'S COUNSEL]: Certainly.

THE COURT:—slides this way or slides this way [sic], or
sits up or sits down . . .

Ms. Trott was involved in Adriana's case since May 2010,
and visited Adriana and Grandmother once a month. On July
7, 2011, the following colloquy ensued during the hearing:

---

as a review of the trial court's exercise of discretion. *In re Megan L.,*
995 P.2d at 1064.

16. The trial was scheduled to be held in the southwest region of New
Mexico. The witnesses resided or were located in the northern area of
New Mexico. *In re Megan L.,* 995 P.2d at 1063.

[ADRIANA'S COUNSEL]: And what have you observed about [Grandmother's] case for Adriana?

[MS. TROTT]: I think she has provided excellent care for her. She certainly has everything materially that she needs at her apartment. When she talks to her, she has a firm but a gentle voice with her. She's able to easily get her attention. Adriana is responsive. I don't see any fear with Adriana. And I think just as she's getting to her age now she has a little gleam in her eye when she wants to do something or she knows she's being, you know, corrected or something like that.

■ Demeanor-based credibility is a witness' outer appearance and mannerisms while testifying before the fact finder. *State Bd. of Physicians v. Bernstein*, 167 Md.App. 714, 759, 894 A.2d 621 (2006). Credibility is at issue in any case concerning testimonial evidence. *Dpt. of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 299, 641 A.2d 899 (1994). For instance, the credibility of a witness in a criminal case is regularly a significant issue. *Sivells v. State*, 196 Md.App. 254, 278, 9 A.3d 123 (2010), *cert. granted* 418 Md. 397, 15 A.3d 298 (2011). Here, Ms. Trott was a disinterested party, who testified to Adriana's general welfare during her placement with Grandmother. Thus, we agree with the court that Ms. Trott's demeanor and credibility were not likely to be critical to the outcome of the proceedings, to the extent that her physical presence was required.

We do discern that another jurisdiction has ruled contrary to what we hold today. In *People ex rel. O.S.*, 701 N.W.2d 421, 424 (S.D.2005), the mother, whose parental rights were terminated, sought to present expert testimony by telephone. The South Dakota trial court denied the testimony because it was untimely and because the court desired to ascertain the expert's credibility. *Id.* The trial court stated:

The first time I heard from you was this morning when you requested a telephonic conference so your expert witness could appeal telephonically. Not now or no way by telephone. You're judging credibility of the witness. . . .,[sic]

but you can't judge it on the telephone and it's not going to happen telephonically, period.

*Id.* at 427. The South Dakota Supreme Court concluded that the trial court did not abuse its discretion. *Id.*

*People ex rel. O.S.* is distinguishable from the case sub judice. In our case, Ms. Trott was not testifying as an expert, but rather as a lay witness who possessed personal knowledge of Grandmother's relationship with Adriana. Furthermore, in *People ex rel. O.S.*, 701 N.W.2d at 427, other than the credibility element, the exclusion of the telephone testimony was predicated on the untimeliness of the request, which was brought for the first time during the morning of the TPR hearing. Adriana's motion was filed fourteen days prior to the first day of trial, and fifteen days prior to the date that the testimony was offered. Although untimely, the court found that there was good cause to permit Ms. Trott's testimony.

■ Mother lastly asserts that substantial prejudice resulted because she was not able to have face-to-face cross-examination. In *In re Adoption/Guardianship No. 6Z980001*, 131 Md.App. 187, 190, 748 A.2d 1020 (2000), we determined if the trial court erred in disallowing an imprisoned father to participate in the termination of parental rights proceeding by speaker phone. The Montgomery County Department of Health and Human Services petitioned the trial court for guardianship with the right to consent to adoption. *Id.* at 189, 748 A.2d 1020. The father was imprisoned for conspiracy to distribute cocaine, and filed a motion to participate in the trial by speaker phone, citing the impossibility of being transported to the proceeding. *Id.* at 189–90, 748 A.2d 1020. The motion was denied, but the father could obtain the certified copies of the audiotapes, in which the court offered him sixty days to submit an affidavit. *Id.* at 190, 748 A.2d 1020.

Despite the father's affidavit reflecting the arguments he desired to assert at trial, the court terminated his rights and granted the petition for guardianship. *Id.* at 191, 748 A.2d 1020. The father appealed and asserted that his Sixth Amendment's right to confrontation was violated. *See id.* at

191–92, 748 A.2d 1020. The trial court held that a case involving the termination of parental rights was a civil proceeding, and therefore the Sixth Amendment conferred no right of confrontation. *Id.* at 192, 748 A.2d 1020 (citing *People in Interest of C.G.*, 885 P.2d 355, 357 (Colo.Ct.App.1994)).

In *Salerian v. Md. State Bd. of Physicians*, 176 Md.App. 231, 256, 932 A.2d 1225 (2007), we determined whether the trial court erred in permitting an incarcerated witness to testify by telephone in an administrative proceeding. The defendant, a psychiatrist, publicized information that was related to him during sessions with the incarcerated witness, who was charged with espionage. *Id.* at 236, 932 A.2d 1225. The plaintiffs, the witness and his wife, filed a complaint with the Maryland State Board of Physicians ("Board"). *Id.* By the time the hearing was conducted, the witness had been convicted of espionage and was serving a life sentence in a federal prison in Colorado. *Id.* at 243, 932 A.2d 1225. Because of the restrictions imposed by his detention, the witness was required to testify by telephone. *Id.*

The ALJ found that the defendant was liable and imposed a two year probation period and a $5,000 fine. *Id.* at 238, 932 A.2d 1225. The defendant appealed, and the trial court affirmed the Board's decision. *Id.* On appeal to our Court, the defendant asserted that the telephone testimony was "so fraught with problems" that it "denied [him] a fair hearing" because the telephone connection had to be reconnected every fifteen minutes. *Id.* at 255–56, 932 A.2d 1225. Furthermore, there were times when the witness could not be heard clearly. *Id.* at 256, 932 A.2d 1225.

The ALJ found that the defendant had a " 'full and fair opportunity to cross examine the [witness], via telephone, and had every opportunity to request that the [witness] repeat his responses to the satisfaction of [c]ounsel.' " *Id.* Additionally, the witness' testimony was supported by other witnesses who testified in person at the hearing. *Id.* Hence, there was substantial evidence in the record, independent of the telephone testimony, to substantiate the Board's conclusion. *Id.* We affirmed the trial court's judgment, and found that the admission of the telephone testimony was permissible. *See id.*

at 238, 932 A.2d 1225. *See also In re D.S.*, 333 S.W.3d 379, 387–88 (Tex.App.2011) ("At times when the father said he was unable to hear, the court directed the witnesses and counsel to speak loudly. At one point during testimony the telephone connection was lost, briefly restored, and lost again. The court substituted telephones and allowed the witness to be re-questioned.").

In *In re Megan L.*, 995 P.2d at 1064, *supra*, the mother noted the possibility that some of CYPD's witnesses would be called by her as rebuttal witnesses, and noted the impracticality of doing so if they were not physically present in court. The New Mexico court examined the mother's cross-examination of the witnesses, and found that her cross-examination was extremely limited. *Id.* at 1067. The mother had an unrestricted opportunity for cross-examination and the court directed CYPD to make its witnesses available for rebuttal. *Id.* at 1068. As a result, there was no violation of procedural due process rights nor an abuse of discretion. *Id.*

In *In re Juvenile Appeal (Docket No. 10155)*, 446 A.2d at 811–12, *supra*, the court permitted the incarcerated father to obtain the complete transcript, including his counsel's cross-examination of the maternal grandmother. The father argued that because the court denied his motion for continuance until he could be present at the TPR hearing, this weakened the effectiveness of the cross-examination. *Id.* The Supreme Court of Connecticut concluded that the father was offered the opportunity to defer cross-examination entirely until the father reviewed the transcript, but he decided against this. *Id.* Moreover, the cross-examination was not defective or incomplete. *Id.* Thus, the trial court did not err. *Id.* at 815. *See also State ex rel. Juvenile Dep't of Lane County v. Stevens*, 100 Or.App. 481, 786 P.2d 1296, 1299 (1990) (The father's counsel performed a thorough and significant cross-examination despite the father's absence.).

Here, Ms. Trott's testimony was corroborated by other witnesses who testified in person at the hearing, including the

Department's social worker, Natalie Gimperling, whose testimony revealed:

> Yes, [Grandmother was] beyond an appropriate placement for her granddaughter. She [was] meeting all of her needs. She ... stepped up, became licensed as a foster parent, which meant that she met all of that state's regulations and requirements for someone to be approved, and ... soon to be approved as an adoptive resource as well.

> \* \* \*

> Adriana view[ed] [Grandmother] as a mother figure. She, you know, was completely engaged with her, was giving her lots of affection, both, you know, vice versa. Very happy, excited, you know, and [Grandmother] was providing me with all kinds of updates on how well she [was] doing and was just a proud and beaming grandmother.

Similar to *In re D.S.*, 333 S.W.3d at 387–88, the counsels elevated their voices to ensure that Ms. Trott could hear the questions. The following colloquy ensued:

> [ADRIANA'S COUNSEL]: Your Honor, may I approach?
>
> THE COURT: Approach who? She's on the phone.
>
> [ADRIANA'S COUNSEL]: I was going to get close so she [could] hear me, but I can just talk very loudly if you'd like.
>
> THE COURT: Can you hear her?
>
> [MS. TROTT]: Yes. Barely, but I can hear her.
>
> THE COURT: All right. She said you'd better get closer.
>
> \* \* \*
>
> THE COURT: Do you want to get closer, too?
>
> [MOTHER'S COUNSEL]: I'd better.
>
> THE COURT: All right.

Unlike *Salerian* and *In re D.S.*, in the case *sub judice*, there were no phone disconnections or any other technological problems.

Mother's counsel asked Ms. Trott the following during cross-examination:

[MOTHER'S COUNSEL]: [Grandmother] ... she's not been approved as an adoptive placement at this point, correct?

[MS. TROTT]: She is—I'm in the process of writing that study. I have not completed it.

[MOTHER'S COUNSEL]: Okay. So she has not, in fact, been approved at this point.

[MS. TROTT]: No, she has not.

[MOTHER'S COUNSEL]: Okay. That's my only question.

Although, there is no Sixth Amendment right to confrontation in this civil proceeding, Mother still reserved her right to cross-examine Ms. Trott. Our review of the record reveals that Mother's ability to effectively cross-examine was not stifled because Ms. Trott testified by telephone. Mother had a full and fair opportunity to cross-examine, but chose to limit her cross-examination to one question. We conclude that (1) Adriana's inadequate notice was not an inconvenience to Mother; (2) Ms. Trott's demeanor and credibility were not likely to be critical to the outcome of the proceedings; and (3) Mother had a fair opportunity to cross-examine Ms. Trott. Hence, the court did not abuse its discretion in permitting the telephone testimony.

## III. RELEVANCY

### A. Did the Trial Court Err in Admitting Irrelevant Evidence?

 Relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. Generally, the trial court has wide discretion when considering the relevancy of evidence. *State v. Simms*, 420 Md. 705, 724, 25 A.3d 144 (2011) (citations omitted). "While trial judges are vested with discretion in weighing relevancy in light of unfairness or efficiency considerations, trial judges do not have discretion to admit irrelevant evidence." *Id.* (citing *See Pearson v. State*,

182 Md. 1, 13, 31 A.2d 624 (1943)) (noting that " 'the rule [of discretion] will not be extended to facts obviously irrelevant as well as prejudicial to the defendant' "). The *de novo* standard of review applies to the trial court's conclusion of law that the evidence at issue is or is not " 'of consequence to the determination of the action.' " *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 620, 17 A.3d 676 (2011) (citations omitted).

Adriana asserts that Grandmother's reference to the severity of the shooting incident, the injuries sustained, and her recovery was directly related not only to Grandmother's ability to be a fit parent, but also to whether continuing the legal relationship between Mother and Adriana was detrimental. Likewise, the Department avers that the shooting and Grandmother's recovery were probative to the question of whether Mother posed a safety issue to Adriana, and insofar as it had a bearing on Grandmother's ability to care for Adriana and develop a positive emotional bond with her. In the court's assessment of Mother's objection to Grandmother's testimony, the following colloquy ensued:

> THE COURT: No, we have to get to the relevant, [sic] why would it not be relevant in terms of an interaction or how she has overcome what happened to her in the past with respect to her relationship with her own daughter?"
>
> [MOTHER'S COUNSEL]: Your Honor, I argue that that [sic] has nothing to do with any decision regarding why she needs, why her, my client's parental rights need to be terminated. I think that it's being introduced to establish, quite honestly, some level of drama in the case that is unnecessary and prejudicial to my client.
>
> \* \* \*
>
> THE COURT: Well, we haven't heard what she had to say yet—
>
> \* \* \*
>
> THE COURT:—to know if it's dramatic or not. So it's overruled. Go ahead. Answer the question.

It has long been established that a parent's past conduct is relevant to a consideration of the parent's future conduct. *In re Dustin T.*, 93 Md.App. 726, 731, 614 A.2d 999 (1992) (citing *See, e.g., McCabe v. McCabe*, 218 Md. 378, 383, 146 A.2d 768 (1958)) (" 'In making our decision [as to the future of the infant at issue] we should not gamble about that future. We can only judge the future by the past.' "). Reliance upon past behavior as a basis for ascertaining the parent's present and future actions directly serves the purpose of the CINA statute. *Id.* at 732, 614 A.2d 999.

In *In re Dustin T.*, 93 Md.App. at 733, 614 A.2d 999, we determined whether a mother's pre-natal drug use was relevant to her ability to provide adequate care for her child. Following the child's birth, he tested positive for cocaine. *Id.* at 731, 614 A.2d 999. The child was declared a CINA and the court continued the commitment for placement in temporary foster care. *Id.* at 729, 614 A.2d 999. On appeal, predicated on the above-mentioned law, we held that the mother's prior drug use was relevant to whether she could provide sufficient care for the child. *Id.* at 733, 614 A.2d 999.

In the case *sub judice*, Grandmother testified that:

Thank you. First of all, I want to say is [sic] that I don't have any ill will against my daughter. I'm not here bash [sic] her or anything like that. I forgave her for what she did. I still love her. I love my granddaughter regardless of what people may think.

\* \* \*

You know. When I was in the hospital, I was out for a while. I don't know how long. I couldn't even tell you. I was in a coma. And when I came to there [sic] were nurses around me because the doctor had given me up and called the family to let them know that I may not make it.

\* \* \*

And to make a long story short, to go on to the, what you call it, the recovery part where I had to go [sic] rehab. They sent me to rehab. The doctor sa[id], "Well, [Grandmother], be expected to stay in rehab for at least six

months." I said, "Six months?" I went into rehab. I did everything I could, had to do as far as the walking and pushing myself. A lot of mornings and days I did not feel like it. But I made myself do it and I came out of rehab in six weeks, not six months.

And that was, I had always been a strong person because I had strong parents and family. And then when I left rehab, my brother took me in his home and I had to go to, well, it's okay, North Carolina to live with him for two years. And what he did, I had to have other operations. My brother would take off from work and take me back, bring me back to Baltimore, Maryland to have my operations. . . .

\* \* \*

And that's what I did. But for two years, I mean, and then my brother would push me up the steps. I couldn't walk when I first got there. And I couldn't get out the bed by myself. They would pull my arms up, a nurse would come in once a week to monitor me and my blood pressure and change my wounds and all of that.

My sister-in-law would put me in the shower and I would have to sit on a bench and she would wash me. . . . But then after my last operation and I got well enough, I moved away and he used to come and visit me on a regular basis—

\* \* \*

Yes, my brother. And come and visit me. And I still had, like, a nurse that would come when I had to go to doctors and nurses and stuff, you know. And it took a while. I mean, I'm not completely well but there are things that I can do and there are little limitations and I have wear [sic] a band for the rest of my life because my stomach is messed up so bad.

We find that Grandmother's testimony regarding her recovery was relevant to the TPR proceeding because Grandmother's recuperation demonstrated the extent of the damage caused by Mother's violent conduct. Mother suffered from a psychiatric episode and believed that Grandmother was complicit in a conspiracy against her. After an argument ensued,

Mother left Grandmother's residence, and returned with a handgun, shooting Grandmother in the chest and abdomen. Grandmother's testimony demonstrated the gravity of the injuries that she sustained since (1) the doctor estimated a six month rehabilitation period; (2) Grandmother traveled from North Carolina to Baltimore to undergo surgical procedures; (3) Grandmother was unable to walk or bathe herself; and because (4) she must utilize a medical band for the remainder of her life. Grandmother's testimony also denoted her ability to care for Adriana, despite the shooting incident, Mother's inability to raise Adriana, and the potential peril she posed to Adriana's health and well-being.

■ "It is well settled in Maryland that a judgment in a civil case will not be reversed in the absence of a showing of error *and* prejudice of the appealing party." *In re Ashley E.*, 158 Md.App. 144, 164, 854 A.2d 893 (2004). "In that context, prejudice means that it is likely that the outcome of the case was negatively affected by the court's error." *Id.* (citations omitted). We find that there was no prejudice, since it was important to address both whether Mother's conduct posed any potential adverse impact on Adriana, as well as whether Grandmother was physically capable of caring for Adriana. As a result of the plausibility of Mother's future violent conduct, the court did not err in admitting the testimony.

Overall, the juvenile court considered all the factors enumerated in § 5–323(d) of the Family Law Article and found clear and convincing evidence that Mother was unfit to care for Adriana because of her chronic and severe mental illness. The court found that it was in Adriana's best interest to terminate Mother's parental rights. Hence, the court did not abuse its discretion.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**